NEWBY, Justice.
In this case we consider whether plaintiffs, individual investors in undeveloped real estate, may recover against a bank and its appraisers for their alleged participation in a scheme to defraud investors by artificially inflating property values in the years preceding the national real estate crisis. Plaintiffs allege, essentially, that they would not have purchased certain real property but for faulty appraisal information and that, in any event, the bank should have discovered and disclosed the inflated appraised property values to them. The complaint reveals that plaintiffs did not view, receive, order, or even inquire about an appraisal before purchasing the property, nor that their purchases were contingent upon an appraisal, faulty or not. Because no legal duty exists at law between a debtor and creditor, or between a bank’s appraisers and a purchaser, plaintiffs’ claims, as pled, fail. Moreover, because plaintiffs fail to sufficiently allege justifiable reliance upon the faulty appraisal information, or lack thereof, or that plaintiffs’ injuries were proximately caused by either the bank or the appraisers, dismissal is proper.
Plaintiffs are purchasers of undeveloped real property located in one of several planned residential communities in Brunswick County, North Carolina, developed and marketed by defendant Mark A. Saunders (collectively, Coastal Communities).[1] Like many others throughout the nation, plaintiffs invested in real property shortly before the collapse of the real estate market. Taking the well-pled allegations in plaintiffs’ complaint as true, the record reveals the following:
*442 In 2004 Saunders, a real estate developer, began marketing lots in the Coastal Communities. Saunders purchased unimproved real property through his company, MAS Properties, LLC, subdivided the property into lots, and then deeded the parcels to various corporate entities for sale to investors. During the “pre-development stage” of the proposed subdivisions, Saunders marketed the undeveloped lots with plans to improve them within two years after purchase.
On 8 August 2005, Saunders, acting through MAS Properties, purchased approximately one hundred acres of land in Shallotte Township, Brunswick County, North Carolina. Eleven days later, MAS Properties transferred the property to Rivers Edge Golf Club & Plantation, Inc. (Rivers Edge),[2] which became the basis for the investments at issue here. Rivers Edge recorded various subdivision plats thereafter, continuing through 2006.
Saunders marketed the Rivers Edge property to potential investors through various promotional materials and sales events, including invitation packages, brochures, community maps, and artistic representations. These artistic renditions included maps and sketches of planned community amenities, like “a southern style clubhouse,” “pool, outdoor hot tub, [and] fitness center,” “walking/nature trails and sidewalks,” and “other recreational amenities.” Saunders invited investors to special pre-development marketing events designed to drive sales. For example, he hosted a “big tent” event with food and music to kick off the Rivers Edge development and implemented a lottery system to give interested investors priority selection over lots. “ [Prospective purchasers were urged to execute a ‘Homesite Reservation’ and submit a ‘Reservation Deposit’ amounting to up to 10% of the purchase price of the property selected in order to have their names placed in the Priority Selection drawings.” • According to the Homesite Reservation document, the ten-percent deposit would be applied toward an earnest-money down payment for the purchase of the underlying property.
Saunders offered various financial incentives to promote business, including “pre-development pricing,” payment by the developer of two years of interest on lot financing, “and $400 to $500 toward closing costs.” Saunders furnished prospective investors a detailed “HUD Property Report” and additional materials that disclosed a variety of details including the development plans, construction guidelines, and *443 estimated timelines. All of these documents were provided in a large binder containing several hundred pages. A series of property reports included the current status of construction and amenities and many of these documents disclosed significant delays. Investors were asked to sign a document acknowledging “that they had received a copy of the Property Report and [had been] given an opportunity to read the Property Report before signing any contract or agreement.” Plaintiffs state that they purchased the vacant properties from Saunders, marketed for their “good investment potential,” and relied on his representations that the undeveloped properties were “a financially sound investment that offered little risk.”
Plaintiffs characterize Saunders’s marketing strategies as creating a “false sense of urgency for potential buyers to purchase the undeveloped property with seemingly little risk.” Plaintiffs assert that Saunders’s agents and employees “encouraged the Plaintiffs and other prospective buyers to purchase more than one lot” and that Saunders marketed the invitation events as “exclusive,” when in reality “hundreds, if not thousands,” were invited. Plaintiffs allege Saunders “pushed” his sales assistants “to go out in teams and pretend to be sales agents and interested buyers during sales events and property showings” and that Saunders “required [his sales assistants] to drive Range Rovers or other expensive Sports Utility Vehicles.”
From 2004 to 2007, defendant Branch Banking and Trust Company (BB&T)[3] served as primary lender for the majority of Saunders’s real estate investors who sought bank financing, including plaintiffs. As Saunders’s business grew, he established The Mortgage Company of Brunswick, Inc. (TMC), a private mortgage brokerage, to help facilitate the lending process. TMC thereafter assisted Saunders’s investors through the loan application process and referred them to BB&T, which then paid TMC a fee for each referral. Internally, BB&T engaged a local firm, James Powell Appraisals, LLC (the Appraisers),[4] to prepare appraisals on some of the properties. The bank did not require full appraisals on the early lot sales with transaction values less than $250,000. Of the limited number of appraisals that BB&T did obtain, the bank used them for its own internal underwriting purposes.
*444 From May 2005 through the summer of 2006, each plaintiff reserved one or more properties during a sales event at Rivers Edge and executed a sales contract. After executing the sales contract and obligating themselves to purchase the property, each plaintiff financed his or her investment with a loan through BB&T. Plaintiffs received a full Property Report sometime during the transaction but deny having the opportunity to read it before signing a sales contract. Rivers Edge provided plaintiffs financial incentives consisting of payments for two years of interest and $400 to $500 credits at closing.
On 26 March 2010, two years after the collapse of the national real estate market and four to five years after their initial investment, plaintiffs commenced this action asserting eighteen claims against Saunders, his various companies, BB&T, and the Appraisers.[5] Each of plaintiffs’ claims as stated incorporates by reference and is based in part upon the following allegations:
40. The Defendant Saunders, through the corporate identity of the Defendant MAS Properties, purchased undeveloped and unimproved parcels of real property throughout Brunswick County, North Carolina and thereafter partitioned the property into lots of proposed subdivisions. The Defendants Saunders and MAS Properties then deeded the property to one of the Defendant Saunders’ various corporate entities, including the Defendant Rivers Edge. Under the control and direction of the Defendant Saunders, the agents and employees of the various corporate entities, including the Defendants Rivers Edge and/or Coastal Communities, thereafter marketed the subdivisions and immediately resold the lots to purchasers at grossly inflated prices.
[[Image here]]
84. Upon information and belief, the Defendant Saunders and/or the agents and employees of the various corporate entities under the control and direction of the Defendant Saunders, including the Defendants Coastal Communities and Rivers Edge, made an arrangement with a local appraiser, James Powell of James Powell Appraisals, LLC, to ensure that appraisals would *445 be generated as described above, using comparable sales of other properties marketed and sold by the Defendant Coastal Communities, including property in Rivers Edge, at the inflated prices.
[[Image here]]
90. Upon information and belief, the Defendants Powell and Rabello thereby engaged in the fabrication and use of fraudulently overstated appraisals to justify the financing of Coastal Communities properties.
[[Image here]]
98. The Plaintiffs and other property owners relied upon the Defendants’ misrepresentations when purchasing property, and paying inflated prices for the property, within one or more of the undeveloped subdivisions. Absent the Defendants’ misrepresentations, Plaintiffs and other property owners would not have purchased the property from the Defendants.
[[Image here]]
99. Upon information and belief, the Defendant Saunders and/or the agents and employees of the various corporate entities under the control and direction of the Defendant Saunders, including the Defendants Coastal Communities and/or Rivers Edge, made an arrangement with local lenders, including the Brunswick County, North Carolina, regional office of BB&T, to ensure that the lenders would rely upon the previously described appraisals which manipulated property values.
Plaintiffs assert the following claims against BB&T: (1) fraud, (2) unjust enrichment, (3) violation of North Carolina’s RICO statute, (4) breach of duty of good faith and fair dealing/negligent supervision, (5) unfair and deceptive trade practices, (6) civil conspiracy, and (7) violation of North Carolina’s Mortgage Lending Act. Plaintiffs assert the following claims against the Appraisers: (1) negligence, (2) negligent misrepresentation, (3) fraud, (4) unjust enrichment, (5) violation of North Carolina’s RICO statute, (6) civil conspiracy, and (7) unfair and deceptive trade practices. In addition to compensatory damages, plaintiffs seek a preliminary injunction to prevent foreclosure on the subject properties, rescission of the underlying sales contracts, treble damages *446 for unfair and deceptive trade practices, and punitive damages against both parties.
Plaintiffs premise each of their claims against BB&T on allegations that the bank wrongfully omitted information about the loan and appraisal process, most specifically, that faulty appraisals significantly overstated the value of the investment properties and that the bank had a duty to discover and disclose this information.[6] Plaintiffs do not allege that BB&T or the Appraisers made any direct representations to them. Plaintiffs do not allege that they received, requested, or inquired about an appraisal at any time before purchasing the investment properties or that they were prevented from so doing. Plaintiffs do not allege that the sales were contingent on financing or an appraisal. In fact, of the *447 remaining properties at issue in this action, the complaint reveals that BB&T ordered only two appraisals for its own internal purposes.
On 28 June 2010, BB&T and the Appraisers moved to dismiss the complaint for failure to state a claim under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. On 1 June 2011, the trial court denied plaintiffs’ motion for a preliminary injunction to prevent foreclosure proceedings, concluding, inter alia, that plaintiffs failed to demonstrate a likelihood of success on the merits of their claims because a lender does not generally owe its borrower a duty beyond the lender’s contractual obligations. Anderson v. Coastal Cmtys. at Ocean Ridge Plantation, Inc., No. 09 CVS 1042, ¶¶ 14-24 (N.C. Super. Ct. Brunswick County June 1, 2011).
On 27 June 2011, the trial court entered an opinion and order concluding that all claims against BB&T were “premised upon wrongful omissions by BB&T regarding the loan and appraisal process,” but that “BB&T did not owe Plaintiffs a duty to disclose the details of the loan process not required to be disclosed under state or federal law or under the terms of the loan agreements.” The trial court granted BB&T’s motion to dismiss. Anderson, 2011 WL 2381781, ¶¶ 16-20 (N.C. Super. Ct. June 3, 2011). On 13 June 2012, the trial court entered an opinion and order concluding, inter alia, that plaintiffs could not have relied upon appraisals they did not receive, or that did not in fact exist, at the time of their decisions to purchase and thus granted the Appraisers’ motion to dismiss on all claims. Anderson, 2012 WL 1948767, ¶¶ 59-61, 124 (N.C. Super. Ct. May 30, 2012).[7] On 16 May 2014, plaintiffs appealed, and on 10 October 2014, this Court certified the case for review prior to determination in the Court of Appeals. N.C.G.S. § 7A-31(a), (b)(2) (2013); N.C. R. App. P. 15(e)(2).
In essence, plaintiffs argue that they would not have purchased the properties but for faulty appraisal information. Plaintiffs claim that the underlying appraisals were the key to Saunders’s complex scheme to sell undeveloped real estate to investors at “grossly inflated prices” *448 and that, using this faulty information, Saunders controlled the entire loan process from application to appraisal to closing. Plaintiffs argue, essentially, that BB&T owed them a legal duty, resembling a fiduciary duty, created either by the general relationship between a bank and its borrower, the duty of good faith and fair dealing, or by the Mortgage Lending Act (MLA). Plaintiffs argue BB&T breached this duty by, inter alia, “concealing material facts for the purpose of influencing, persuading, or inducing the Plaintiffs to take a loan.” Similarly, plaintiffs assert that the Appraisers breached a duty of care owed to them when they prepared faulty appraisals for the bank.
It is undisputed, however, that plaintiffs decided to purchase the investment properties without consulting an appraisal. Moreover, plaintiffs obligated themselves to purchase the properties independent of the loan process. Plaintiffs have not alleged that they ordered, viewed, or requested appraisal information at any time, or that they were prevented from doing so. Furthermore, of the properties remaining at issue in this action, the complaint reveals that BB&T obtained only two appraisals for its own internal underwriting purposes. As alleged, all misrepresentations during the sales process, if any, were made by Saunders, not by BB&T or the Appraisers.
As such, BB&T is entitled to dismissal of all claims because plaintiffs’ complaint reveals an absence of both law and facts necessary to establish that the bank owed a duty to disclose the information that plaintiffs contend was wrongfully omitted. Moreover, plaintiffs have failed to sufficiently allege justifiable reliance on any omission by the bank before they purchased the investment properties and have failed to sufficiently establish that any action by BB&T was the proximate cause of their harm.
Dismissal of an action under Rule 12(b)(6) is appropriate when the complaint “fail[s] to state a claim upon which relief can be granted.” N.C.G.S. § 1A-1, Rule 12(b)(6) (2013). “[T]he well-pleaded material allegations of the complaint are taken as true; but conclusions of law or unwarranted deductions of fact are not admitted.” Sutton v. Duke, 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970) (quoting 2A James Wm. Moore et al., Moore’s Federal Practice ¶ 12.08 (2d ed. 1968)). When the complaint on its face reveals that no law supports the claim, reveals an absence of facts sufficient to make a valid claim, or discloses facts that necessarily defeat the claim, dismissal is proper. Wood v. Guilford County, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002) (citation omitted). We review appeals from dismissals under Rule 12(b)(6) de novo. Bridges v. Parrish, 366 N.C. 539, 541, 742 S.E.2d 794, 796 (2013).
*449 In an ordinary debtor-creditor transaction, the lender’s duties are defined by the loan agreement and do not extend beyond its terms. Dallaire v. Bank of Am., N.A., 367 N.C. 363, 368, 760 S.E.2d 263, 266-67 (2014) (citations omitted). This Court has held on many occasions that “[o]ne who executes a written instrument is ordinarily charged with knowledge of its contents.” Ussery v. Branch Banking & Trust Co., _ N.C. _, _, 777 S.E.2d 272, 279 (2015) (citation omitted). A fiduciary duty generally arises when one reposes a special confidence in another, and the other “in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.” Dallaire, 367 N.C. at 367, 760 S.E.2d at 266 (quoting, inter alia, Dalton v. Camp, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001)). “[T]he law does not typically impose on lenders a duty to put borrowers’ interests ahead of their own,” id. at 368, 760 S.E.2d at 267, though “it is possible, at least theoretically, for a particular bank-customer transaction to ‘give rise to a fiduciary [relationship] given the proper circumstances,’ ” id. at 368, 760 S.E.2d at 267 (quoting Branch Banking & Trust Co. v. Thompson, 107 N.C. App. 53, 61, 418 S.E.2d 694, 699, disc. rev. denied, 332 N.C. 482, 421 S.E.2d 350 (1992)). Here plaintiffs fail to allege any special circumstances that could establish a fiduciary relationship. Plaintiffs’ allegations establish nothing more than a typical debtor-creditor relationship, wherein any duty would be created by contract through the loan agreement.
Even if a plaintiff can show circumstances giving rise to a duty beyond the four comers of the loan agreement, absent a sufficient allegation and showing of justifiable reliance, a plaintiff’s negligence claims fail. See id. at 369, 760 S.E.2d at 267. “Reliance is not reasonable if a plaintiff fails to make any independent investigation,” id. at 369, 760 S.E.2d at 268 (quoting State Props., LLC v. Ray, 155 N.C. App. 65, 73, 574 S.E.2d 180, 186 (2002), disc. rev. denied, 356 N.C. 694, 577 S.E.2d 889 (2003)), or fails to demonstrate he was “prevented from doing so,” id. at 370, 760 S.E.2d at 268. Further, a plaintiff must establish that the lender proximately caused his injuiy. See, e.g., Bumpers v. Cmty. Bank of N. Va., 367 N.C. 81, 88-90, 747 S.E.2d 220, 226-27 (2013).
The MLA, which was enacted by the General Assembly in 2001,[8] applied solely to loans “primarily for personal, family, or household use, *450 primarily secured by either a mortgage or a deed of trust on residential real property located in North Carolina.” N.C.G.S. § 53-243.01(15) (2005) (repealed 2009); see also Fazzari v. Infinity Partners, LLC, _ N.C. App. _, _, 762 S.E.2d 237, 243 (2014) (“The MLA applied to residential loans and was intended to protect residential borrowers.” (citation omitted)). The operative provisions of the MLA during the relevant period here are:
§ 53-243.11. Prohibited activities.
In addition to the activities prohibited under other provisions of this Article, it shall be unlawful for any person in the course of any mortgage loan transaction:
(1) To misrepresent or conceal the material facts or make false promises likely to influence, persuade, or induce an applicant for a mortgage loan or a mortgagor to take a mortgage loan, or to pursue a course of misrepresentation through agents or otherwise.
[[Image here]]
(8) To engage in any transaction, practice, or course of business that is not in good faith or fair dealing or that constitutes a fraud .upon any person, in connection with the brokering or making of, or purchase or sale of, any mortgage loan.
[[Image here]]
(11) To influence or attempt to influence . . . the development, reporting, result, or review of a real estate appraisal sought in connection with a mortgage loan.
N.C.G.S. § 53-243.11 (2005) (repealed 2009).
The MLA does not apply here because plaintiffs fail to allege that they purchased the properties for “personal, family, or household use,” and the complaint indicates they purchased nothing more than undeveloped real estate, characterized as an “investment.” See Fazzari, _ N.C. App. at _, 762 S.E.2d at 243 (finding the MLA inapplicable when the “Plaintiffs’ own complaint describes the sale of the founders’ lots as an ‘Investment Scheme’ and consistently refers to the investment purchasers as ‘investors’ ”). Plaintiffs purchased the undeveloped lots from Saunders, marketed as an “investment” and for its “good investment potential.” In fact, some individual plaintiffs purchased multiple, *451 noncontiguous lots. Further, plaintiffs could not have used the property for residential purposes at the time of purchase, or for some time thereafter, because infrastructure and amenities had yet to be built and were delayed well into the future. Saunders informed plaintiffs of these delays before plaintiffs closed on their loans with BB&T, as expressly acknowledged in their signed receipts of the Property Reports. Plaintiffs’ assertions that they did not read the Property Reports, or that the Reports were buried in hundreds of pages of disclosure material, are insufficient to bring their investment purchases within the ambit of the MLA. See Ussery, _ N.C. at -, 777 S.E.2d at 279.
BB&T could not have violated the MIA by acting in bad faith when it did not disclose information it did not have, was not asked to provide, or was not contractually obligated to produce. See Suntrust Bank v. Bryant/Sutphin Props., LLC, 222 N.C. App. 821, 833, 732 S.E.2d 594, 603 (concluding that the bank did not breach the covenant of good faith and fair dealing when the claimant failed to establish breach of the contract), disc. rev. denied, 366 N.C. 417, 735 S.E.2d 180 (2012); see also Bicycle Transit Auth. v. Bell, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985) (“There is implied in every contract a covenant by each party not to do anything which will deprive the other parties thereto of the benefits of the contract.” (emphasis added) (quoting Harm v. Frasher, 5 Cal. Rptr. 367, 374, 181 Cal. App. 2d 405, 417 (1960))). Accordingly, plaintiffs’ attempts to establish a breach of duty under the MIA or the duty of good faith and fair dealing fail.
■ In sum, plaintiffs’ allegations are insufficient to establish that BB&T owed or breached any duty. Plaintiffs have not alleged that their investment purchases were contingent on an appraisal nor have they alleged breach of contract by the bank. The complaint reveals that plaintiffs obligated themselves to purchase the properties without consulting an appraisal. Because plaintiffs’ claims depend upon BB&T’s alleged omission of appraisal information, which BB&T had no duty to provide, plaintiffs’ claims, as pled, fail.
Even if we were to find here, for the first time, that debtor-creditor relationships give rise to some heightened duty, plaintiffs have not alleged that they inquired, or were prevented from inquiring, about the appraisal information, and thus they have not established justifiable reliance. Dallaire, 367 N.C. at 370, 760 S.E.2d at 268 (concluding that when the borrowers “put forth no evidence that they made inquiry or were prevented from doing so, they have failed to demonstrate [ ] justified rebanee”); see also Calloway v. Wyatt, 246 N.C. 129, 135, 97 S.E.2d 881, 886 (1957) (“A sale of land will not be vitiated by false representations *452 of the seller . . . where the purchaser had sufficient opportunity to examine the subject of the representations but made no examination or investigation, and was not prevented from so doing by any artifice of the seller....” (quoting Hays v. McGinness, 208 Ga. 547, 547, 67 S.E.2d 720, 720 (1951) (syllabus by the court))).
Moreover, plaintiffs fail to allege actual reliance upon an appraisal at all and therefore, fail to establish proximate cause. Fazzari, _ N.C. App. at _, 762 S.E.2d at 243-45 (finding it well established that “the plaintiff must show actual reliance on the alleged misrepresentation in order to establish [proximate cause]” and denying relief when “the purchase contracts were not subject to any appraisal contingencies”). Accordingly, without establishing justifiable reliance or proximate cause, plaintiffs’ claims fail. See Bumpers, 367 N.C. at 88-90, 747 S.E.2d at 226-27 (requiring actual reliance to establish proximate cause element of an unfair and deceptive trade practices claim); Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 323 N.C. 559, 568-71, 374 S.E.2d 385, 391-93 (1988) (noting that reasonable reliance must be shown to make a case for actionable fraud); Booe v. Shadrick, 322 N.C. 567, 570, 369 S.E.2d 554, 555-56 (1988) (requiring a “measurable” benefit conferred upon and accepted by the defendant for an unjust enrichment claim); Reid v. Holden, 242 N.C. 408, 414-15, 88 S.E.2d 125, 130 (1955) (implying that proximate cause is required for civil conspiracy claim seeking damages caused by acts done by one or more conspirators); Hoke v. E.F. Hutton & Co., 91 N.C. App. 159, 162-63, 370 S.E.2d 857, 859-60 (1988) (requiring actual reliance on the “predicate act” alleged in a complaint to establish proximate cause for federal RICO claim). Accordingly, BB&T is entitled to dismissal on all claims.
Similar to the allegations against BB&T, each of plaintiffs’ claims against the Appraisers, as pled, depends on an alleged duty of care owed by the Appraisers, coupled with assertions that plaintiffs justifiably relied on their faulty appraisals and that the Appraisers proximately caused plaintiffs’ injury.[9] Because plaintiffs’ complaint reveals an absence of both law and facts necéssary to sufficiently allege that the Appraisers owed them a duty of care or to establish the substantive elements of a legally recognized claim, dismissal for the Appraisers on all claims is proper.
*453 In Raritan River Steel Co. v. Cherry, Bekaert & Holland, we reviewed in depth the duty an accountant owes to nonclients who make use of an accountant’s prepared financial reports, and we find that case instructive here. 322 N.C. 200, 207-16, 367 S.E.2d 609, 613-18 (1988); see also Ballance v. Rinehart, 105 N.C. App. 203, 206-08, 412 S.E.2d 106, 108-09 (1992) (applying the tenets of Raritan to liability in the real estate appraisal context). An accountant who prepares financial reports for his client clearly owes a duty of care to his client, Raritan, 322 N.C. at 210, 214, 367 S.E.2d at 614, 617; however, the duty may extend to “persons . . . whom [the accountant] knows and intends will rely on his opinion, or whom [the accountant] knows his client intends will so rely,” id. at 214, 367 S.E.2d at 617. In the latter circumstance, “the accountant must know of his client’s intent at the time the accountant audits or prepares the information.” Id. at 210, 367 S.E.2d at 614. The duty does not extend “liability to all persons whom the accountant should reasonably foresee might obtain and rely on the accountant’s work.” Id. at 210, 367 S.E.2d at 615; see id. at 214, 367 S.E.2d at 617.
Further, liability will only extend if there is justifiable reliance. Id. at 209-10, 214, 367 S.E.2d at 614, 617. “[A] party cannot show justifiable *454 reliance on information contained in audited financial statements without showing that he relied upon the actual financial statements themselves ....” Id. at 206, 367 S.E.2d at 612 (emphasis added). As discussed previously, to establish justifiable reliance a plaintiff must sufficiently allege that he made a reasonable inquiry into the misrepresentation and allege that he “was denied the opportunity to investigate or that he could not have learned [. . . the true facts] by exercise of reasonable diligence.” Dallaire, 367 N.C. at 369, 760 S.E.2d at 267 (quoting Pinney v. State Farm Mut. Ins. Co., 146 N.C. App. 248, 256, 552 S.E.2d 186, 192 (2001), disc. rev. denied, 356 N.C. 438, 572 S.E.2d 788 (2002)). Similarly, proximate cause in the appraisal context requires that “plaintiffs actually relied on defendant’s appraisal report.” Alva v. Cloninger, 51 N.C. App. 602, 611, 277 S.E.2d 535, 541 (1981). These limitations “hold accountants to a standard that accounts for their contemporary role in the financial world . .. [while balancing] the need to protect them from liability that unreasonably exceeds the bounds of their real undertaking.” Raritan, 322 N.C. at 215, 367 S.E.2d at 617.
Plaintiffs here fail to establish that the Appraisers owed them a duty of care. The complaint reveals that BB&T, not plaintiffs, hired the Appraisers to evaluate properties for the bank’s own internal underwriting purposes; thus, BB&T, not plaintiffs, was the Appraisers’ client. See Fazzari, _ N.C. App. at _, 762 S.E.2d at 242 (“[A]ppraisals and underwriting are for the benefit of the lenders, not for the borrowers.”). At no time did plaintiffs engage, communicate with, or deal with the Appraisers directly, nor did plaintiffs receive, review, or request any information from the Appraisers. Likewise, plaintiffs have not sufficiently alleged that the Appraisers knew that BB&T intended to use the appraisals to benefit or influence plaintiffs in any way when they prepared them. See Raritan, 322 N.C. at 213, 367 S.E.2d at 616 (“[Accountants should not be liable in circumstances where they are unaware of the use to which their opinions will be put.”). Because plaintiffs fail to establish a legal duty, their negligence claims against the Appraisers fail.
Moreover, even if we were to find that the Appraisers did owe plaintiffs a duty of care, plaintiffs fail to sufficiently allege that they justifiably relied upon any representation by the Appraisers, or lack thereof, or that the Appraisers proximately caused injury to plaintiffs. Plaintiffs assert, essentially, that they indirectly relied upon the Appraisers’ faulty information because BB&T chose to close on their loans. Plaintiffs’ complaint fails to establish that they relied on actual appraisals; thus, plaintiffs fail to establish justifiable reliance and their negligence claims must fail. See id. at 205-07, 367 S.E.2d at 612-13. Further, because the *455 complaint reveals that plaintiffs chose to purchase the properties independent of an appraisal and independent of their decision on whether and how to finance their purchases, plaintiffs’ allegations are insufficient to establish that the Appraisers proximately caused injury to plaintiffs. Accordingly, plaintiffs’ remaining claims fail. See Alva, 51 N.C. App. at 611, 277 S.E.2d at 541; see also Bumpers, 367 N.C. at 88-90, 747 S.E.2d at 226-27; Myers & Chapman, 323 N.C. at 568, 374 S.E.2d at 391; Booe, 322 N.C. at 570, 369 S.E.2d at 555-56; Reid, 242 N.C. at 414-15, 88 S.E.2d at 130; Hoke, 91 N.C. App. at 162-63, 370 S.E.2d at 859-60. In sum, dismissal of plaintiffs’ claims against the Appraisers, as pled, was proper.
In conclusion, the complaint reveals that plaintiffs chose to invest in undeveloped real property without consulting an appraisal. For the properties at issue here, the bank ordered only a limited number of appraisals, which were for its own internal use. It is undisputed that plaintiffs did not view, request, or inquire about an appraisal before deciding to purchase the properties. Any representations regarding property development, investment potential, or the like were made by developer Saunders, not the bank or the Appraisers. Taking the well-pled material allegations of the complaint as true, BB&T and the Appraisers are entitled to dismissal on all claims set forth in plaintiffs’ complaint. Accordingly, we affirm the decision of the trial court.
AFFIRMED.

. The communities include the following residential subdivisions located in Brunswick County, North Carolina: Ocean Isle Palms, Ocean Ridge Plantation, Rivers Edge, and SeaWatch at Sunset Harbor. Plaintiffs allege Saunders acted individually and through his various corporate entities.

. Rivers Edge Golf Club & Plantation, LLC and Rivers Edge Golf Club & Plantation, Inc. are referred to interchangeably as “Rivers Edge” throughout the complaint.

. BB&T Collateral Service Corporation served as trustee on the deeds of trust securing the loans issued by Branch Banking and Trust Company and also is a named defendant. Both defendants are collectively referred to as “BB&T” throughout this opinion.

. James Powell Appraisals, LLC was formed in 2007. Prior to that time James Powell Appraisals operated as a sole proprietorship. James Powell employed defendant Lynn Rabello. Collectively these parties are referred to as “the Appraisers.”

. Plaintiffs’ amended complaint includes eighteen causes of action. The Chief Justice designated the action as a mandatory complex business case on 7 April 2010.

. The complaint reveals, inter alia, that each of plaintiffs’ stated claims is “premised upon wrongful omissions by BB&T regarding the loan and appraisal process” and relies upon faulty appraisal information therein as follows:
(1) Plaintiffs’ Mortgage Lending Act violation claim relies on allegations of BB&T’s “misrepresenting or concealing material facts for the purpose of influencing, persuading, or inducing the Plaintiffs to take a loan” and that BB&T “improperly influenc[ed] the . . . reporting, result, and/or review of real estate appraisals.”
(2) Plaintiffs’ duty of good faith and fair dealing claim relies on allegations that “BB&T was aware, or should have been aware, of the fact that the Plaintiffs were being misled and/or induced to enter into the contracts in ignorance of facts materially increasing the risks,” and that BB&T was aware of “fraudulent and inflated appraisals,” but “failed to inform the Plaintiffs of such facts as required by its duty of good faith and fair dealing.”
(3) Plaintiffs’ RICO claim relies on allegations that BB&T’s “misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving the Plaintiffs and obtaining their money for... pecuniary gain,” and that BB&T “rel[ied] upon fraudulent... appraisals of the property.”
(4) Plaintiffs’ conspiracy claim relies on allegations that BB&T entered into an agreement “to commit... unlawful acts, practices, plans, schemes, and transactions to defraud and mislead Plaintiffs,” that the agreement ensured that BB&T “would rely upon the [fraudulent] appraisals,” and that defendants would “control the appraisal and lending process.”
(5) Plaintiffs’ fraud claim relies on allegations that BB&T was “under a duty to disclose the truth regarding all defendants’ misrepresentations and concealed material facts of which only they knew or could have known, and to make a full and open disclosure of all such information,” and that BB&T approved and disbursed money at closing “notwithstanding their knowledge of and dependence upon the fraudulently overstated appraisals.”
(6) Plaintiffs’ unfair and deceptive trade practices claim relies on allegations that BB&T’s “conduct, as alleged [in the aforementioned claims by reference], constitutes unfair and/or deceptive acts or practices.”
(7) Plaintiffs’ unjust enrichment claim relies on allegations that “inequitable enrichment, benefits, and ill-gotten gains [were] acquired as a result of the” omissions alleged in the aforementioned claims, and that plaintiffs’ purchases were at “inflated prices.”

. The record indicates the following plaintiffs were voluntarily dismissed from this action without prejudice: John Merritt on 10 July 2012; John Swann and Lisa Swann (referred to in the amended complaint as plaintiffs “Swan”), Audrey Vamum, Richard Vamum, and Lucas Wilson on 15 February 2013; and Steve Chaney and Barry McGoff on 21 March 2014. Deborah Charuk, William Charuk, Maria Curatolo, Kathleen Jordan, Thomas Jordan, Tanner Markley, and Joel Schenkel voluntarily dismissed without prejudice their claims against Saunders, TMC, and his corporate entities in April 2014. We take notice of plaintiffs’ attorneys’ motion to withdraw as counsel for Kenneth Amesen, Alan Walbaum, and Camille Walbaum dated 3 May 2013, which appears to remain pending at the trial court. N.C. R. App. P. 14(c)(1).

. Act of Aug. 23, 2001, ch. 393, sec. 2, 2001 N.C. Sess. Laws 1425, 1425-40, repealed and recodified by Act of July 22, 2009, ch. 374, 2009 N.C. Sess. Laws 681 (titled “North Carolina Secure and Fair Enforcement (S.A.F.E.) Mortgage Licensing Act”) (codified as amended at N.C.G.S. §§ 53-244.010 to 53-244.121).

. The complaint reveals, inter alia, that each of plaintiffs’ stated claims against the Appraisers seeks to impose a duty, assert justifiable reliance, or establish proximate cause as follows:
(1) Plaintiffs’ negligence claim relies on allegations that the Appraisers “owed a duty to the Plaintiffs to exercise due care in the performance of the appraisals,” that the *453 Appraisers “communicat[ed] a misleading or fraudulent report,” and that plaintiffs’ “damages were reasonably foreseeable to the [Appraisers] and were proximately cause [sic] by the[ir] negligence.”
(2) Plaintiffs’ negligent misrepresentation claim relies on allegations that their “interest in their . . . transaction places them within a limited class to whom the [AJppraisers ... owe a duty of due care,” that plaintiffs “relied on the false and misleading information supplied by the [Appraisers],” and that their “reliance was justifiable.”
(3) Plaintiffs’ fraud claim relies on allegations that the Appraisers were “under a duty to disclose the truth regarding their misrepresentations” and that they delivered “false and misleading [appraisals].”
(4) Plaintiffs’ RICO claim relies on allegations that, “[a]s a direct and proximate result [of the Appraisers’ participation in the RICO scheme], the Plaintiffs have been injured in their business or property” and that the Appraisers “conducted] . . . misleading and inflated appraisals of the property.”
(6) Plaintiffs’ unfair and deceptive trade practices claim relies on allegations that plaintiffs suffered damages “[a]s a proximate and direct result of the [Appraisers’] unfair and/or deceptive acts or practices” as alleged in the aforementioned claims.
(6) Plaintiffs’ unjust enrichment claim relies on allegations that “inequitable enrichment, benefits, and ill-gotten gains [were] acquired as a result of the wrongful conduct” alleged in the aforementioned claims and that plaintiffs’ purchases were “at inflated prices.”
(7) Plaintiffs’ conspiracy claim relies on allegations that the damages they sustained were “a direct and proximate result of the acts committed” by the Appraisers and that the Appraisers “artificially manipulat[ed] the values of the properties.”