IN THE SUPREME COURT OF NORTH CAROLINA

No. 102A20-3

Filed 22 March 2024

CHESTER TAYLOR III, RONDA and BRIAN WARLICK, LORI MENDEZ, LORI MARTINEZ, CRYSTAL PRICE, JEANETTE and ANDREW ALESHIRE, MARQUITA PERRY, WHITNEY WHITESIDE, KIMBERLY STEPHAN, KEITH PEACOCK, ZELMON McBRIDE

v.

BANK OF AMERICA, N.A.

Appeal pursuant to N.C.G.S. § 7A-30(2) (2021) from the decision of a divided panel of the Court of Appeals, 287 N.C. App. 358, 882 S.E.2d 605 (2022), reversing an order entered on 3 October 2019 by Judge Lisa C. Bell in Superior Court, Mecklenburg County, and remanding to the trial court for further proceedings. Heard in the Supreme Court on 2 November 2023.

*Robinson Elliott & Smith, by William C. Robinson and Dorothy M. Gooding; Aylstock, Witkin, Kreis, & Overholtz, PLLC, by Samantha Katen, Chelsie Warner, pro hac vice, and Caitlyn Miller, pro hac vice; and Robert F. Orr, for plaintiffs-appellees.*

*McGuireWoods LLP, by Bradley R. Kutrow and Dylan M. Bensinger; and Goodwin Procter, LLP, by Keith Levenberg, pro hac vice, and James W. McGarry, pro hac vice, for defendant-appellant.*

NEWBY, Chief Justice.

North Carolina law has long recognized that a plaintiff must initiate an action within the statutorily prescribed period to avoid dismissal of his claim. These statutes of limitations strike a balance between one party's right to assert a claim and another party's right to be free from a stale claim. Here plaintiffs' claims arise from

defendant's alleged scheme to fraudulently deny mortgage modifications to plaintiffs and then foreclose on their homes. The complaint reveals that each plaintiff knew, or reasonably should have known, of his or her injuries and the alleged fraud at least four to seven years before filing the complaint. As a result, plaintiffs' claims are time-barred by the applicable statutes of limitations. Accordingly, we reverse the decision of the Court of Appeals.

Plaintiffs are citizens of North Carolina, California, Wisconsin, Arizona, Michigan, or Nevada.[1] Their claims arise from defendant's alleged misadministration of the Home Affordable Modification Program (HAMP). HAMP was a federal mortgage relief program "implemented in March of 2009 to assist the millions of American homeowners facing foreclosure" after the 2008 recession. Under the program, homeowners, including plaintiffs, were given the opportunity to modify the terms of their mortgages after submitting an application and completing a brief trial payment period.

Each plaintiff elected to participate in HAMP through his or her mortgage servicer, defendant. Plaintiffs alleged they were each a victim of defendant's "fraudulent scheme" to "intentionally prevent thousands of eligible applicants from receiving permanent HAMP modifications." Specifically, plaintiffs alleged that

---

[1] Because we must assume that plaintiffs' allegations are true when considering this matter, *see Turner v. Hammocks Beach Corp.*, 363 N.C. 555, 559, 681 S.E.2d 770, 774 (2009), the following recitation of facts is taken from plaintiffs' amended complaint.

defendant collected plaintiffs' HAMP trial period payments while simultaneously delaying their permanent mortgage modifications in order to "set [p]laintiff[s] up for foreclosure."

For example, one of the plaintiffs, Chester Taylor III, contacted defendant seeking a HAMP modification in February 2010. According to the complaint, defendant's loan representative advised Taylor "to refrain from making his regular mortgage payments" because he "had to be two to three months behind on his mortgage loan" to qualify for HAMP. Taylor later learned that this statement was false, but at the time, he relied on this statement and defaulted on his mortgage so that he could participate in HAMP.

About one month later, Taylor submitted a "properly completed" HAMP application to defendant. Taylor received a letter approving him for a HAMP trial period and requesting that he make three "trial payments" to receive a permanent modification to his mortgage terms. Taylor then began making trial payments to defendant hoping that he would receive a permanent modification and "save his home" from foreclosure.

Over the course of the next two years, however, defendant collected Taylor's trial period payments while also purposefully delaying Taylor's permanent loan modification. Defendant delayed the modification process by repeatedly telling Taylor there were problems with his application and requesting that he resubmit certain paperwork. For example, defendant would tell Taylor that his documents were "not

current," "incorrect," or "missing" even though defendant had already received all necessary documents. Taylor alleges that defendant's representatives made these false statements "for the specific purpose of frustrating the HAMP application process to ensure a modification was ultimately denied, resulting in foreclosure." Continuing to rely on these statements, Taylor resubmitted his application and documentation more than thirty times between 2010 and 2012. Ultimately, defendant never approved Taylor for a permanent HAMP modification and foreclosed on Taylor's home in September 2012. By the time defendant foreclosed on Taylor's home, Taylor had made fourteen trial period payments to defendant. Defendant retained the money but never applied these payments to Taylor's account.

All plaintiffs allege that they experienced a similar pattern of conduct after applying with defendant for a HAMP modification. The complaint reveals that each plaintiff lost his or her home to foreclosure between April 2011 and January 2014. Plaintiffs further allege that defendant "fraudulently concealed the facts giving rise to" their claims and that, as a result, they "could not have reasonably discovered the facts that formed the basis of their fraud claims against [defendant] until they retained their attorneys."

As alleged in their complaint, plaintiffs are not the only purported victims of defendant's fraudulent misadministration of HAMP. Homeowners filed numerous lawsuits "across the country" in state and federal courts alleging claims based on the exact same conduct. *See, e.g.*, *In re Bank of Am. Home Affordable Modification*

*Program (HAMP) Cont. Litig.*, M.D.L. No. 10-2193-RWZ, 2013 WL 4759649 (D. Mass. Sept. 4, 2013). Defendant's scheme was so widespread that in March 2012, the federal government and forty-nine state attorneys general sued defendant for conduct "involv[ing] identical issues in fact and law" as those alleged by plaintiffs. Under a consent judgment entered in that lawsuit in April 2012, defendant agreed to pay over $2 billion to homeowners to "remediate harms" resulting from its HAMP misconduct. These lawsuits were ongoing during the time that plaintiffs were seeking their own HAMP modifications from defendant, and plaintiffs acknowledged the existence of these lawsuits in their complaint.

Plaintiffs filed their complaint in this case on 1 May 2018 and their amended complaint on 13 March 2019. The complaint alleged claims based on common law fraud, fraudulent concealment, intentional misrepresentation, promissory estoppel, conversion, unjust enrichment, unfair and deceptive trade practices, and, in the alternative, negligence. On 11 April 2019, defendant filed a motion to dismiss the amended complaint. The trial court granted defendant's motion to dismiss on the grounds that all plaintiffs' claims were barred by the applicable three-year and

four-year statutes of limitations.[2] *See* N.C.G.S. §§ 1-52(9), 75-16.2 (2021). Plaintiffs appealed to the Court of Appeals.

In a 29 December 2022 opinion, the Court of Appeals majority held that the trial court erred in dismissing plaintiffs' claims as barred by the statute of limitations. *Taylor v. Bank of Am., N.A.*, 287 N.C. App. 358, 361, 882 S.E.2d 605, 608 (2022). The Court of Appeals majority reasoned that because the complaint "suggest[s] [p]laintiffs remained unaware of [d]efendant's alleged fraudulent scheme for many years," plaintiffs had pled sufficient facts to avoid dismissal of their claims on statute of limitations grounds. *Id.* at 360, 882 S.E.2d at 607. Accordingly, the Court of Appeals reversed the trial court's ruling and remanded the matter for further proceedings. *Id.* at 361, 882 S.E.2d at 608.

The dissent would have affirmed the trial court and held that all plaintiffs' claims were barred by the statute of limitations. *Id.* at 361, 882 S.E.2d at 608 (Dillon, J., dissenting). The dissent concluded that, at the very latest, the statute of limitations began to run when defendant foreclosed on each of plaintiffs' homes. *Id.* The dissent reasoned that "the statute of limitations ceased to be tolled" at that time because "each plaintiff became aware of his/her injury" at that moment. *Id.* Accordingly, because the foreclosures occurred "more than three years before the complaint was filed," the dissent concluded that all plaintiffs' claims were

---

[2] The trial court concluded that plaintiffs' claims were also barred by *res judicata* and collateral estoppel.

time-barred. *Id.* Defendant appealed to this Court based on the dissent. *See* N.C.G.S. § 7A-30(2) (2021).[3]

Here we must determine whether the trial court erred in dismissing plaintiffs' claims as time-barred by the applicable statutes of limitations. We review dismissals under Rule 12(b)(6) of the Rules of Civil Procedure de novo. *Kirby v. N.C. Dep't of Transp.*, 368 N.C. 847, 852, 786 S.E.2d 919, 923 (2016). In doing so, we "treat the plaintiff[s'] factual allegations as true" and view them "in the light most favorable to plaintiffs." *Turner*, 363 N.C. at 559, 681 S.E.2d at 774. Dismissal pursuant to Rule 12(b)(6) is "proper when the complaint 'fail[s] to state a claim upon which relief can be granted.'" *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5, 802 S.E.2d 888, 891 (2017) (quoting *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 448, 781 S.E.2d 1, 7 (2015) (alteration in original)). "When the complaint on its face . . . discloses facts that necessarily defeat the claim," the complaint must be dismissed. *Arnesen*, 368 N.C. at 448, 781 S.E.2d at 8 (citing *Wood v. Guilford County*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002)). Specifically, dismissal is appropriate when a complaint alleges "uncontroverted facts" demonstrating that the cause of action is barred by the statute of limitations. *Latham v. Latham*, 184 N.C. 55, 61, 113 S.E. 623, 626 (1922).

---

[3] *See* N.C.G.S. § 7A-30(2) (2021), *repealed by* Current Operations Appropriations Act of 2023, S.L. 2023-134, § 16.21(d), https://www.ncleg.gov/EnactedLegislation/SessionLaws/PDF /2023-2024/SL2023-134.pdf. The repeal of N.C.G.S. § 7A-30(2) only applies to cases filed with the Court of Appeals on or after 3 October 2023. *See* Current Operations Appropriations Act § 16.21(e).

This Court has "long recognized that a party must initiate an action within a certain statutorily prescribed period after discovering its injury to avoid dismissal of a claim." *Christenbury*, 370 N.C. at 5, 802 S.E.2d at 891. Statutes of limitations are intended to "afford security against stale demands, not to deprive anyone of his just rights by lapse of time." *Id.* at 5−6, 802 S.E.2d at 891 (quoting *Shearin v. Lloyd*, 246 N.C. 363, 371, 98 S.E.2d 508, 514 (1957), *superseded by statute*, N.C.G.S. § 1-15(b) (1971), *as enacted by* An Act to Provide that a Cause of Action Accrues When Injury Is Or Should Have Been Known, ch. 1157, § 1, 1971 N.C. Sess. Laws 1706, 1706, *on other grounds as recognized in Black v. Littlejohn*, 312 N.C. 626, 630−31, 325 S.E.2d 469, 473 (1985)). This protection is strictly enforced because "[w]ith the passage of time, memories fade or fail altogether, witnesses die or move away, [and] evidence is lost or destroyed." *Estrada v. Burnham*, 316 N.C. 318, 327, 341 S.E.2d 538, 544 (1986), *superseded by statute*, N.C.G.S. § 1A-1, Rule 11(a) (Cum. Supp. 1988), *as enacted by* An Act . . . to Make Changes in Rule[ ] . . . 11(a) of the Rules of Civil Procedure, ch. 1027, § 55, 1985 N.C. Sess. Laws (Reg. Sess. 1986) 617, 639, *on other grounds as stated in Turner v. Duke Univ.*, 325 N.C. 152, 163−64, 381 S.E.2d 706, 712−13 (1989).

A three-year statute of limitations applies to all of plaintiffs' claims, N.C.G.S. § 1-52(1), (4), (5), (9), (16) (2021), except for their unfair and deceptive trade practices

claim, which is subject to a four-year statute of limitations, *id.* § 75-16.2.[4] Generally, a statute of limitations runs from the moment a plaintiff is injured. *Shearin*, 246 N.C. at 367, 98 S.E.2d at 511 ("In general a cause or right of action accrues, so as to start the running of the statute of limitations, as soon as the right to institute and maintain a suit arises."). For claims sounding in fraud, however, "the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud or mistake." N.C.G.S. § 1-52(9). This Court has repeatedly held that the statute of limitations for fraud claims is tolled until "discovery of the facts" constituting the fraud "or from the time when they should have been discovered in the exercise of proper diligence or reasonable . . . prudence." *Latham*, 184 N.C. at 64, 113 S.E. at 627; *see also Feibus & Co. (N.C.) v. Godley Constr. Co.*, 301 N.C. 294, 304−05, 271 S.E.2d 385, 392 (1980).

This discovery rule tolls the statute of limitations for fraud claims because fraud involves intentional deception and, therefore, may not always be readily discoverable at the moment a plaintiff's injury is complete. *See Forbis v. Neal*, 361

---

[4] Because plaintiffs are from six different states, we must first decide which states' statutes of limitations apply to plaintiffs' claims—the statutes of limitations where plaintiffs' homes were located (the situs of the claims) or North Carolina's statutes of limitations (the forum of the suit). Generally, matters affecting substantive rights of the parties are determined by the law of the situs of the claim, while matters relating to procedure are governed by the laws of the forum state. *Howle v. Twin States Express, Inc.*, 237 N.C. 667, 671−72, 75 S.E.2d 732, 736 (1953). This Court has generally held that "statutes of limitation are clearly procedural" because they "affect[ ] only the remedy" available to a party "and not the right to recover." *Boudreau v. Baughman*, 322 N.C. 331, 340, 368 S.E.2d 849, 857 (1988). Therefore, North Carolina's statutes of limitations apply to plaintiffs' claims.

N.C. 519, 526–27, 649 S.E.2d 382, 387 (2007). Nevertheless, a plaintiff is not permitted "to close his eyes to facts observable by ordinary attention" and thereby to toll the statute of limitations indefinitely. *Latham*, 184 N.C. at 64, 113 S.E. at 627 (quoting *In re Will of Johnson*, 182 N.C. 522, 525, 109 S.E. 373, 375 (1921)). "[A]s soon as the injury becomes apparent to the [plaintiff] or should reasonably become apparent, the cause of action is complete and the limitation period begins to run." *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 493, 329 S.E.2d 350, 354 (1985).

The discovery rule is an objective standard, not a subjective one. It tolls the statute of limitations only until a reasonable person should have discovered the fraud under the circumstances and in the exercise of reasonable prudence. The particular moment that a specific plaintiff alleges he *actually* discovered the fraud is irrelevant. *See Latham*, 184 N.C. at 66, 113 S.E. at 627 (citing *In re Will of Johnson*, 182 N.C. at 525–27, 109 S.E. at 375).

Here we must determine when the statutes of limitations began to run for plaintiffs' claims. As for plaintiffs' non-fraud claims, the allegations of the complaint reveal that each plaintiff's injuries were complete—at the very latest—when they lost their homes. It is clear that by that point in time plaintiffs knew they would not receive a permanent HAMP modification, that defendant would not apply their trial period payments to their mortgage accounts, and that plaintiffs could not save their

homes from foreclosure. Thus, the statutes of limitations that apply to plaintiffs'
non-fraud claims began to run on the date that each plaintiff lost his or her home.

As for plaintiffs' fraud claims, the complaint makes clear that the statute of
limitations also began to run—at the very latest—by the date they lost their homes.
At that point in time, each plaintiff knew, or reasonably should have known, of the
"facts constituting [defendant's] fraud," N.C.G.S. § 1-52(9), that is, defendant's
wrongful delay and denial of plaintiffs' HAMP applications and the resulting
foreclosures on plaintiffs' homes. By the time plaintiffs lost their homes, they were
clearly aware of all facts regarding their prior interactions with defendant during the
HAMP application process. Thus, on the dates that plaintiffs lost their homes,
plaintiffs knew all the facts from which their fraud claims arise, and therefore, the
statute of limitations for those fraud claims began to run.

Accordingly, all plaintiffs' claims accrued and the statutes of limitations began
to run at the latest by the date that each plaintiff lost his or her home. Each plaintiff
lost his or her home sometime between April 2011 and January 2014. Thus, the latest
point in time any plaintiff could have filed a complaint was January 2017, or in the
case of an unfair and deceptive trade practices claim, January 2018. Plaintiffs did not
file their original complaint until May 2018. Therefore, their claims are time-barred.

Plaintiffs argue that the discovery rule tolls the statute of limitations for their
fraud claims beyond the dates of their foreclosures because they could not have
discovered defendant's fraud until they consulted their current counsel. Plaintiffs'

own allegations foreclose this argument, however, because their alleged experiences during the HAMP application process should have put a reasonable person on notice that something was wrong. The complaint reveals that each plaintiff "contacted [d]efendant repeatedly" during the application process "to ensure proper compliance with HAMP." Defendant, however, repeatedly asked plaintiffs to resubmit the same application materials numerous times without ever advancing the application process. Some plaintiffs complied with these resubmission requests fifteen, nineteen, or even thirty times over the course of several years.

Simultaneously, defendant told each plaintiff he or she could receive a permanent mortgage modification after making three trial payments. Defendant, however, collected as many as fourteen trial payments from plaintiffs without ever modifying their mortgages. All the while, defendant continued to delay approval of plaintiffs' applications and eventually, foreclosed on their homes. Even if plaintiffs did not understand the full extent of defendant's misconduct at the time of their foreclosures, their own alleged frustrations with the HAMP application process were sufficient to put them on notice that defendant had not acted in good faith and that they needed to investigate further.

Additionally, the complaint makes clear that had plaintiffs investigated further, they could have easily discovered the ongoing, nationwide litigation involving defendant's similar mistreatment of homeowners throughout the country. They also would have discovered the settlement to which defendant agreed in response to a

2012 lawsuit brought by the federal government and forty-nine state attorneys general for the exact same conduct underlying plaintiffs' claims. Plaintiffs' complaint alleges no facts suggesting that defendant fraudulently concealed any of this public information from plaintiffs. Even when viewed in the light most favorable to plaintiffs, these facts indicate that plaintiffs either knew of defendant's fraud or "should have [ ] discovered [it] in the exercise of ordinary diligence" by the time they lost their homes. *Latham*, 184 N.C. at 64, 113 S.E. at 627 (quoting *In re Will of Johnson*, 182 N.C. at 526, 109 S.E. at 375). Thus, the statute of limitations for plaintiffs' fraud claims began to run on the date that each plaintiff lost his or her home and was not tolled beyond that point in time.

While civil causes of action exist to provide remedies to aggrieved parties, statutes of limitations operate inflexibly and without reference to the merits of a cause of action. Even in the case of fraud, a plaintiff cannot avoid the statute of limitations by "sit[ting] on [his] rights," *Pembee Mfg. Corp.*, 313 N.C. at 493, 329 S.E.2d at 354, or "clos[ing] his eyes to facts observable by ordinary attention," *Latham*, 184 N.C. at 64, 113 S.E. at 627 (quoting *In re Will of Johnson*, 182 N.C. at 525, 109 S.E. at 375). Plaintiffs' complaint reveals that they had notice of their injuries and defendant's alleged fraud at least four to seven years before filing their complaint. Whatever injuries plaintiffs suffered, they lost the right to pursue a remedy for those injuries by failing to exercise ordinary diligence within the statutory limitations period. Because plaintiffs failed to timely file their action before the

statutes of limitations expired, their claims are time-barred, and the trial court did not err in dismissing their complaint. Accordingly, we reverse the decision of the Court of Appeals.

REVERSED.

Justice BERGER did not participate in the consideration or decision of this case.

Justice RIGGS dissenting.

I do not agree with the majority's application of the discovery rule to the plaintiffs' fraud claims because the majority's analysis does not fully align with our discovery rule jurisprudence. The majority anchors its conclusion that the discovery rule does not toll the statute of limitations for plaintiffs' fraud claims beyond the date of foreclosure to two facts or perceptions: (1) that plaintiffs encountered numerous difficulties during the HAMP application process; and (2) that plaintiffs "could have easily discovered" Bank of America's widespread mistreatment of homeowners through the nationwide litigation and a consent judgment entered in that litigation. Relying on these facts and perceptions, the majority concludes that the statute of limitations "began to run—at the very latest—by the time [plaintiffs] lost their homes." This conclusion disregards portions of the complaint and gives the news coverage of problems with the HAMP program more legal significance than the allegations and record support. After considering the complaint and the allegations therein, especially the implications of the consent judgment in earlier Bank of America HAMP program litigation, I would hold that the statute of limitations should be equitably tolled for the fraud claims of those plaintiffs who lost their homes after Bank of America executed the consent judgment. I respectfully dissent.

## I. Analysis

Broadly speaking, our discovery rule jurisprudence demonstrates that

foreclosure itself is insufficient to cause the fraud claims to accrue. That is because the foreclosure process itself does not represent an act constituting fraud nor do the facts surrounding a foreclosure give rise to an inference of fraud. Indeed, the facts that the majority wants us to believe would put a reasonable person on notice to look for fraud—the HAMP application process and news coverage of litigation related to Bank of America's administration of the HAMP program—are not nearly as informative to a reasonable person as the majority would suggest. I dissent because, while I recognize that our jurisprudence requires us to apply an "objective" reasonable person standard to the discovery of fraud, I do not believe we are required to filter every fact through a lens least sympathetic to regular citizens trying to navigate complex bureaucracies.

Under N.C.G.S. § 1-52(9), a cause of action in fraud "shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud or mistake." N.C.G.S. § 1-52(9) (2023). This Court has interpreted this discovery rule "to set accrual at the time of discovery *regardless* of the length of time between the fraudulent act or mistake and plaintiff's discovery of it." *Feibus & Co. N.C., v. Godley Constr. Co.,* 301 N.C. 294, 304 (1980). Typically, however, a duty of inquiry begins "when an event occurs to 'excite [the aggrieved party's] suspicion or put [that party] on such inquiry as should have led, in the exercise of due diligence, to a discovery of the fraud.'" *Forbis v. Neal,* 361 N.C. 519, 525 (2007) (first alteration in original) (quoting *Vail v. Vail*, 233 N.C. 109, 117 (1951)). Significantly, and what

the majority does not address is that this Court has held "[e]quity will deny the right to assert the defense of the statute of limitations when delay has been induced by acts, representations, or conduct, the repudiation of which would amount to a breach of good faith." *Duke Univ. v. Stainback*, 320 N.C. 337, 341 (1987) (citing *Nowell v. Great Atl. & Pac. Tea Co.*, 250 N.C. 575 (1959)).

Applying this principle, we have held that "discovery rules are capable of being construed broadly to comport with the policy of fairness to plaintiffs who are unaware that they have been injured in a legal sense." *Black v. Littlejohn*, 312 N.C. 626, 645 (1985). To determine when these fraud claims would accrue in this complex and allegedly dishonest mortgage assistance program scenario, it is instructive to consider this Court's application of the discovery rule in a different context. In *Black v. Littlejohn* this Court considered the discovery rule in the context of a medical malpractice matter, in which actions accrue when the plaintiff knew or should have known of a latent injury. *Id.* at 628. In that case the plaintiff underwent a hysterectomy after being told by her doctor that nothing else would resolve her endometriosis. *Id.* at 627. After the statute of limitations had run, using the date of the surgery as the date from which the action accrued, plaintiff learned of an FDA-approved medication that may have resolved her condition without requiring a hysterectomy. *Id.* The Court clarified that an injury only triggers the statute of limitations when the plaintiff "discovers, or in the exercise of reasonable care, should have discovered, that she was injured *as a result of defendant's wrongdoing.*" *Id.* at

642 (emphasis added). The Court concluded that the removal of the reproductive organs was not the injury from which the action accrued; instead, the action accrued only once the plaintiff learned that the defendant was negligent by failing to advise her of the alleged alternative treatment. *Id.* at 637, 646–47.

Similarly, here, the facts constituting the fraud are not the foreclosure or loss of the home, but instead the fraudulent business practices Bank of America allegedly employed in each plaintiff's HAMP application process. The majority's assertion that the frustrating HAMP application process itself should have put plaintiffs on notice of fraud conflates what many Americans struggle with daily—navigating financial bureaucracies—with evidence of fraud. Here, in concluding that having to contact Bank of America repeatedly, resubmitting the same application materials numerous times, and making trial payments should have put the plaintiffs on notice of the fraud dramatically expands the investigatory burdens placed on harmed citizens in seeking justice in a court of law, and imposes those burdens earlier. I agree that plaintiffs are not permitted "to close [their] eyes to facts observable by ordinary attention," thereby tolling the statute of limitations indefinitely. *Latham v. Latham*, 184 N.C. 55, 64 (1922) (quoting *In re Will of Johnson*, 182 N.C. 522, 525 (1921)). But the majority's "discovery" inference from plaintiffs' allegations that a complex, bureaucratic loan modification process was difficult to navigate just undercuts the equity inherent in the discovery rule, particularly when there is a power imbalance between the harmed citizen and the sophisticated business perpetrating fraud.

Beyond that, submitting application information, contacting Bank of America, and making trial payments are also part of the normal HAMP servicing guidelines. The line between a HAMP application process that aligns with the servicing guidelines and a fraudulent process is not so bright a line as the majority believes.

This Court has noted that "[t]he presence of fraud, when resorted to by an adroit and crafty person, is at times exceedingly difficult to detect. Indeed, the more skillful and cunning the accused, the less plainly defined are the badges which usually denote it." *Standard Oil Co. v. Hunt*, 187 N.C. 157, 159 (1924). In identifying characteristics of the HAMP application process that—according to the majority—should have put plaintiffs on notice of fraud, the majority overlooks the numerous tactics that plaintiffs allege, and we must assume are true, Bank of America employed to hide, deny, and normalize these deceptive processes. For example, while plaintiffs contacted Bank of America repeatedly during the application process to ensure their compliance with servicing guidelines, the plaintiffs did not know until 2017 that Bank of America was trying to "prevent as many homeowners as possible from obtaining permanent HAMP loan modification while leading the public and the government to believe that it was making efforts to comply with HAMP." Additionally, while each plaintiff was aware that he or she had resubmitted the application material numerous times, the plaintiffs did not know until 2017 that Bank of America purposefully delayed HAMP applications by telling customers that documents were incomplete or missing when, in actuality, the documents were

routinely shredded without review. Finally, the plaintiffs did not have access until 2017 to the declaration from a Bank of America home retention specialist documenting its practice of not providing permanent modifications and of sending foreclosure notices to borrowers who were current on their temporary modification payments.

Because of the nature of these fraud claims, the facts constituting the fraud reside primarily within the files of Bank of America, its computer systems, and the memories of its employees. As such, "a jury must decide when fraud should have been discovered in the exercise of reasonable diligence under the circumstances." *Forbis*, 361 N.C. at 524. The notions of fundamental fairness underpinning the discovery rule contradict an argument that the statute of limitations can bar plaintiffs' claims before plaintiffs are aware of defendant's tortious conduct— especially when the defendant's deceptive denials delayed or interfered with the plaintiffs' discovery of the conduct. *Misenheimer v. Burris*, 360 N.C. 620, 626 (2006). In the context of a complex federal mortgage modification program, when the plaintiffs are not experienced or trained financial experts and are simply trying to navigate what are undoubtedly challenging processes, the majority's cramped application of the discovery rule rewards Bank of America's deceptive behaviors.

Next, in its focus on what plaintiffs might have "easily discovered" based on widespread litigation related to Bank of America's activities during the mortgage crisis, the majority misses the forest for the trees. It seems to me to be a dangerous

path to tread—looking to news coverage or public understanding of complicated financial operations or litigation surrounding that—to make assumptions about what an average, "reasonable" person would derive from the existence of widespread litigation. I would not adopt this approach at all, but to the extent we credit the "easy" discovery of Bank of America's alleged misdeeds, there was also available in the public domain the "easy" discovery of Bank of America's denials and repudiation of any malfeasance. In early 2012, Bank of America publicly affirmed in a consent judgment—without admitting prior fraudulent behavior—that it would properly administer the HAMP program per the servicing guidelines moving forward from 2012. This assurance coincided with an agreement to pay more than two billion dollars in penalties to reimburse Bank of America customers "whose homes were finally sold or taken in foreclosure between and including January 1, 2008, and December 31, 2011." Plaintiffs who experienced difficulties with the HAMP application process after entry of the 2012 consent judgment might expect, rightfully, that any shortcomings in the administration of the process had been remediated based on Bank of America's own binding representations in a settlement with the federal government.

The majority's rule—focused on what plaintiffs "should have known" *based on news reports or the existence of litigation about* Bank of America's problems administering HAMP—invites the question that follows logically: how are we to treat Bank of America's public denials of fraud and assurances that no such fraud would

occur going forward? We addressed the impact of denials of wrongdoing on this equitable calculus in *Misenheimer v. Burris*, in which the plaintiff suspected tortious conduct and asked the defendant—more than three years before the claim was filed—if he was engaging in criminal conversation. 360 N.C. at 621. The defendant responded with a denial leading us to expressly hold that failure to apply the discovery rule in the face of the defendant's deceptive denial had "the unacceptable consequence of rewarding" the defendant's deception. *Id.* at 626.

In short, the majority's approach here perpetuates the problem we sought to curtail in *Misenheimer*. Although the statute of limitations is generally only tolled until "an event occurs to excite the aggrieved party's suspicion or put [that person] on such inquiry as should have led, in the exercise of due diligence, to a discovery of the fraud," *Forbis,* 361 N.C. at 525, (cleaned up) Bank of America's signature on the consent judgment is conduct concealing any continuing fraud. Although I would be hesitant to follow the majority down the road of "what would a reasonable person know or have reason to suspect" based on news coverage or just the existence of litigation, to the extent this Court's jurisprudence takes that path, we must then grapple with why a reasonable person could not rely upon a consent judgment signed by Bank of America, an associate Attorney General of the United States, and representatives of forty-nine states for the proposition that fraudulent activity, if it existed, had ceased.

Beyond Bank of America's public and legally binding denials, many people

experience frustration when attempting to modify a mortgage even under the best of circumstances, and especially when they face imminent default. But that frustration does not necessarily put them on notice of fraud. The discovery of ongoing fraudulent business practices designed to keep homeowners from a HAMP modification should trigger the accrual of the fraud action. Given the conflicting evidence in the complaint about when these homeowners should reasonably have been on notice of the fraudulent schemes—which Bank of America represented were ameliorated—is a question for a finder of fact at trial. *See Forbis*, 361 N.C. at 523–24; *Feibus*, 301 N.C. at 305.

## II.    Conclusion

In sum, I would hold that Bank of America's public affirmations to properly administer the HAMP modification program after entry of the consent judgment equitably toll the statute of limitations for homeowners who lost their homes after Bank of America signed the consent judgment. Therefore, I would affirm the holding of the Court of Appeals reversing the trial court's dismissal of the complaint asserting fraud claims of plaintiffs who lost their homes after Bank of America signed the consent judgment. For these reasons, I respectfully dissent.

Justice EARLS joins in this dissenting opinion.