IN THE SUPREME COURT OF NORTH CAROLINA

No. 267PA19

Filed 1 May 2020

WINSTON AFFORDABLE HOUSING, LLC d/b/a Winston Summit Apartments

v.

DEBORAH ROBERTS

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous, unpublished decision of the Court of Appeals, 828 S.E.2d 755, 2019 WL 2510879 (N.C. Ct. App. 2019), affirming a judgment entered on 3 November 2017 by Judge Denise S. Hartsfield in District Court, Forsyth County. Heard in the Supreme Court on 11 March 2020.

*Blanco, Tackabery & Matamoros, P.A., by Elliot A. Fus and Chad A. Archer, for plaintiff-appellee.*

*Legal Aid of North Carolina, Inc., by Andrew Cogdell, Liza A. Baron, Valene K. Franco, and Celia Pistolis, for defendant-appellant.*

*William D. Rowe, Jack Holtzman, and Carlene McNulty, for North Carolina Justice Center; Elizabeth Myerholtz and Lisa Grafstein, for Disability Rights North Carolina; and J.L. Pottenger Jr., for Yale Law School Housing Clinic; amici curiae.*

EARLS, Justice.

Deborah Roberts is a longtime tenant of the Winston Summit Apartments, having lived there for more than twenty years. The complex is owned by Winston Affordable Housing, LLC (WAH). Winston Summit Apartments is a project-based

Section 8 property. This means that the U.S. Department of Housing and Urban Development (HUD) provides money to the landlord, subsidizing the rents for units at the property and lowering the effective rent for low-income tenants like Ms. Roberts. WAH receives the subsidy payment directly from HUD pursuant to a Housing Assistance Payments (HAP) contract between HUD and WAH. The subsidy is tied to the unit—it is not a voucher that a tenant could take to a different apartment complex to receive a subsidized rental rate.

In late 2016, WAH sought to evict Roberts by terminating her lease for alleged breaches primarily relating to her conduct toward property management staff and conditions in and around her unit. Roberts did not leave. WAH's property management company, Ambling Management Corp. (Ambling), filed a Complaint in Summary Ejectment on 5 January 2017, claiming that Roberts was a holdover tenant. On 9 January 2017, the property manager served Roberts with a ten-day notice to pay rent or quit, alleging that Roberts was in default under "the rental agreement dated 01/01/2007" in the amount of $547. Following a judgment in small claims court, WAH filed an amended complaint. Ultimately, the District Court in Forsyth County entered a judgment evicting Roberts and granting possession of the apartment in which she lived to WAH "based on nonpayment of rent for January 2017 and the first part of February 2017." In doing so, the trial court determined that WAH had waived its claims as to Roberts's alleged lease breaches. The Court of Appeals affirmed, holding that the trial court's findings of fact supported its

conclusion that Roberts's failure to pay rent entitled WAH to possession. *Winston Affordable Hous., L.L.C. v. Roberts*, 828 S.E.2d 755, 2019 WL 2510879 (N.C. Ct. App. 2019).

We reverse the Court of Appeals and remand to the trial court for further findings of fact. First, we hold that the trial court's findings do not support its determination that WAH had waived its right to terminate the lease based on the alleged breaches by Roberts. Second, we hold that terminating either a lease or a federal subsidy for a particular tenant in a federally-subsidized housing arrangement requires compliance with applicable federal law as incorporated in the terms of the lease. Third, we hold that the record does not contain sufficient findings to support the conclusion that WAH is entitled to possession on the basis of nonpayment of rent.

Background

Roberts is a sixty-two-year-old woman with cognitive disabilities. She has lived in her unit at the Winston Summit Apartments since 1997. Prior to the current dispute regarding her lease, she paid $139 per month in rent. Roberts receives a fixed income of $755 per month in addition to food stamps.

WAH alleged that Roberts violated her lease terms by:[1]

> (a)     Harassing Ambling's staff about various issues—including but not limited to management's refusal to provide Tenant with a key to the mail room that would enable Tenant to access other tenants' mail and packages—and making and threatening false claims against Plaintiffs.

> (b)     Spreading pest control powder in common areas and other tenants' apartments, despite the objection of other tenants and despite Ambling's repeated requests that Tenant cease this practice and not interfere with the professional extermination services arranged by Plaintiffs.

> (c)     Keeping her Premises in a cluttered, dirty and unsafe condition.

> (d)     Violating "no smoking" policies.

On 3 October 2016, Roberts received a letter with the subject heading "Notice of Termination of Lease." The letter notified Roberts that "Winston Summit ha[d] elected to terminate [her] lease" and stated that her lease would terminate at the end of the then-current term, which ended 31 December 2016. It alleged that Roberts's "repeated lease violations" had "disrupted the livability of the property, adversely affected the health or safety of residents and staff, the peaceful enjoyment of other

---

[1] Because the trial court determined that WAH waived these alleged breaches by accepting rent payments from Roberts, the trial court necessarily did not consider whether the evidence produced at trial amounted to material noncompliance, which would warrant termination of the lease by its terms. Accordingly, we consider only the claims included by WAH in its amended complaint, assuming their truth for the purposes of this opinion. *Cf. Renwick v. News & Observer Pub. Co.*, 310 N.C. 312, 315, 312 S.E.2d 405, 408 (1984) (stating that allegations in a complaint are taken as true when deciding whether they should be dismissed).

residents to the property, and interfered with the management of the property." The letter provided examples of the offending behavior. It then notified Roberts of when she would have to leave her unit and stated that she was "required to pay [her] full rental amount up to the day [she] move[d] out." The letter then stated: "You have the right to respond in writing or request a meeting within 10 days to dispute this proposed termination. You have the right to defend this action in court."

Roberts did not vacate her apartment by 31 December 2016. WAH's evidence at trial indicated that, on 4 January 2017, the on-site property manager saw Roberts at the mailbox and asked Roberts to come in and sign a document. The document was a HUD form titled "Owner's Certification of Compliance with HUD's Tenant Eligibility and Rent Procedures." In the section marked "Gross Rent Changes and Unit Transfers," the document listed "Tenant Rent" as $532. Roberts signed the document. At the same time, Roberts signed[2] a document titled "Lease Amendment" which read in part:

> This is to notify you that on the basis of our recent review of your income and family composition, your monthly rent has been adjusted as follows:
>
> Contract Rent            $532.00
> Utility Allowance         $61.00
>
> Assistance Payment        $0.00
> Total Tenant Payment      $593.00

---

[2] Roberts appears to have written "Under duress" beneath her signature on this document. We do not consider or opine on the legal significance, if any, of this qualifier.

> Tenant Rent                    $532.00
>
> The new rent is effective with the rent due for the month of 12/31/2016. This notification amends Paragraph 3 of your lease agreement, which sets forth the amount of rent you pay each month. All other provisions of your lease remain in full force and effect. The next scheduled recertification is 01/01/2017.

Both the Lease Amendment and the Owner's Certification of Compliance with HUD's Tenant Eligibility and Rent Procedures were dated 4 January 2017.

On 5 January 2017, Ambling filed a summary ejectment action in Forsyth County Small Claims Court. Then, on 9 or 10 January 2017, Ambling delivered a document to Roberts titled "Ten-Day Notice to Pay Rent or Quit." The document alleged that Roberts owed $547 under her rental agreement and demanded that she pay the amount in ten days or surrender possession of her apartment. If she did not do so, the document stated that WAH would sue her.

On 7 February 2017, the magistrate in Small Claims Court entered judgment in the summary ejectment action in favor of Ambling. Roberts appealed to the District Court for a trial *de novo* on 14 February 2017. The Notice of Appeal form contained the following notice to the appealing party:

> If you are a tenant appealing from a summary ejectment judgment entered against you and you wish to stay on the premises until the appeal is heard, you must SIGN A BOND that you will pay your rent as it becomes due into the Clerk's office; you must PAY IN CASH the amount of rent in arrears as determined by the magistrate; and if the judgment was entered more than five (5) days before the next rental payment is due, you may also have to PAY IN CASH the prorated amount of rent due from the date the

> judgment was entered until the next rental payment is due. Ask the clerk for the bond form (AOC-CVM-304) to allow you to stay on the premises. If you have not signed this bond and paid the prorated amount of cash within ten (10) days after the judgment was entered, the landlord can ask to have the sheriff remove you from the premises even though the case is being appealed.

The magistrate did not assess any amount of rent in arrears to Roberts, but did determine that the rental rate was $532 per month. Consequently, Roberts began paying a monthly rent bond of $532 in mid-February.

On 6 April 2017, WAH filed an amended complaint which made two claims for relief.[3] First, WAH alleged that it was entitled to a judgment for summary ejectment on the basis of (1) alleged lease violations occurring prior to 3 October 2016 and (2) failure to pay rent for January 2017 and part of February 2017. Second, WAH alleged that it was entitled to a monetary judgment reflecting the unpaid rents for January 2017 and part of February 2017. Roberts filed an answer and counterclaims on 7 June 2017. The answer included ten defenses and five counterclaims. Only one of Roberts's counterclaims, that WAH's termination of her rental subsidy constituted an unfair and deceptive trade practice (UDTP) in violation of N.C.G.S. § 75-1.1, survived to trial.

The competing claims were tried in October 2017. On 3 November 2017, the trial court entered judgment in favor of WAH, granting WAH possession of the

---

[3] While it is not entirely clear from the record, it seems that WAH was substituted for Ambling at some point prior to the filing of the amended complaint. This procedural aspect of the case has not been presented for our review.

apartment on the basis of nonpayment of rent and dismissing all other pending claims and counterclaims.  The trial court made the following findings of fact:

> 1.      Plaintiff is the owner of Winston Summit Apartments, 137 Columbine Drive, Winston-Salem, North Carolina, where defendant has been a longtime resident. As of 2016, defendant was leasing Unit 311 (the "Premises") from plaintiff pursuant to a Model Lease for Subsidized Programs (the "Lease") signed on November 2, 2010.
>
> 2.      On October 3, 2016, plaintiff provided defendant with a Notice of Termination of Lease, declaring that the Lease would be terminated effective December 31, 2016 for "material noncompliance" based on repeated lease violations, including violations of rules regarding pest control, smoking, housekeeping and other issues.
>
> 3.      Following the October 3, 2016 notice—but before the December 31, 2016 termination date—plaintiff accepted November and December 2016 rents from defendant.
>
> 4.      Defendant did not vacate the Premises and has continued to reside there.
>
> 5.      On or about January 4, 2017, defendant signed documents presented to her by the plaintiff's management, indicating that $532 per month in rent would be owed by defendant after December 31, 2016 (although defendant previously paid $139 per month in rent and received "Section 8" subsidized rental assistance from HUD).
>
> 6.      This summary ejectment action was commenced on January 5, 2017.
>
> 7.      On or about January 10, 2017, plaintiff's management gave defendant a "Ten-Day Notice to Pay Rent or Quit" regarding defendant's non-payment of January 2017 rent.

8. A judgment for ejectment was granted to plaintiff in Small Claims Court on February 7, 2017. Defendant appealed to District Court.

9. Rents since mid-February have been paid into Court by defendant. However, defendant never paid rents for January 2017 or for the portion of February 2017 accruing prior to her first payment of rent bond into Court.

10. Plaintiff filed an Amended Complaint on April 6, 2017. Plaintiff sought ejectment, based on the violations of the Lease listed in the October 3, 2017 [sic] notice as well as failure to pay January 2017 and early February 2017 rents. Plaintiff also sought a money judgment for the unpaid rents.

11. Defendant filed Counterclaims. The Counterclaims were dismissed prior to trial, except for a claim for Unfair and Deceptive Trade Practices for allegedly "improperly terminating defendant's Section 8 assistance."

12. Plaintiff represented in open court during trial that possession of the Premises was its only priority and that it would voluntarily waive any money judgment.

From these facts, the trial court concluded that WAH had "waived any right to evict defendant based on any Lease violations occurring prior to" its acceptance of rent for November and December 2016 and dismissed WAH's claim for breach of lease other than nonpayment of rent. The trial court also concluded that Roberts should be evicted because she did not pay rent for January 2017 and the first portion of February 2017. Finally, the trial court concluded that Roberts had presented insufficient evidence to establish a UDTP claim regarding the termination of her rental subsidy.

The Court of Appeals affirmed the trial court.  First, the Court of Appeals considered whether Roberts was properly evicted for nonpayment of rent.  The court acknowledged that the parties disputed the appropriate amount of rent, but it was uncontested on appeal that Roberts did not pay rent for January 2017 to mid-February 2017.  *Roberts*, 828 S.E.2d 755, 2019 WL 2510879 at \*3.  As a result, the court concluded that Roberts's failure to pay rent "constituted a breach of lease entitling WAH to possession of the premises."  *Id.*

Second, the Court of Appeals considered whether the trial court appropriately rejected Roberts's UDTP claim.  The Court of Appeals determined that there was "insufficient evidence in this case of an injury proximately caused by the alleged act or practice" and concluded that Roberts had not proved her claim.  *Id.* at \*4.

WAH and Roberts each sought discretionary review in this Court.  Roberts asked us to consider (1) whether she was properly evicted for nonpayment of rent and (2) whether WAH's alleged violations of federal regulations governing the subsidized housing program were unfair trade practices pursuant to N.C.G.S. § 75-1.1.  WAH asked us to consider whether WAH had waived eviction on the basis of Roberts's alleged violations of the lease by accepting rent payments in November and December 2016.  We granted both petitions.

Standard of Review

When reviewing a judgment entered following a bench trial,

-10-

"the trial court's findings of fact have the force and effect of
a jury verdict and are conclusive on appeal if there is
competent evidence to support them, even though the
evidence could be viewed as supporting a different finding."
*Bailey v. State*, 348 N.C. 130, 146, 500 S.E.2d 54, 63 (1998)
(citing *Curl v. Key*, 311 N.C. 259, 260, 316 S.E.2d 272, 273
(1984)). Although findings of fact "supported by competent,
material and substantial evidence in view of the entire
record[ ], are conclusive upon a reviewing court, and not
within the scope [of its] reviewing powers," *In re Berman*,
245 N.C. 612, 616–17, 97 S.E.2d 232, 235 (1957), "[f]indings
not supported by competent evidence are not conclusive
and will be set aside on appeal." *Penland v. Bird Coal Co.*,
246 N.C. 26, 30, 97 S.E.2d 432, 436 (1957) (citing *Logan v.
Johnson*, 218 N.C. 200, 10 S.E.2d 653 (1940)). "[F]acts
found under a misapprehension of the law are not binding
on this Court and will be set aside, and the cause remanded
to the end that the evidence should be considered in its true
legal light." *Hanford v. McSwain*, 230 N.C. 229, 233, 53
S.E.2d 84, 87 (1949) (citing, *inter alia, McGill v. Town of
Lumberton*, 215 N.C. 752, 3 S.E.2d 324 (1939)).

*In re Estate of Skinner*, 370 N.C. 126, 139, 804 S.E.2d 449, 457–58 (2017) (alterations

in original). The trial court's legal conclusions are reviewed de novo. *In re C.H.M.*,

371 N.C. 22, 28, 812 S.E.2d 804, 809 (2018) (quoting *In re Foreclosure of Bass*, 366

N.C. 464, 467, 738 S.E.2d 173, 175 (2013)).

## Analysis

In the proceedings below, WAH claimed that it was entitled to possession on

two bases: alleged lease violations by Roberts and nonpayment of rent in January

-11-

2017 and part of February 2017.[4]  We address the issues of waiver, the purported

lease and subsidy termination, and nonpayment of rent in turn.  We then address the

remand to the trial court, which relates to Roberts's UDTP claim.

**Waiver of lease violations**

As to the alleged lease violations, the trial court determined that WAH waived

any claim based on the breaches because it accepted rent from Roberts after it knew

of the breaches.  On the facts presented by this record, that determination was

erroneous.  Because the trial court did not consider whether Roberts's behavior

amounted to material noncompliance with the lease, we remand for the trial court to

take evidence and make appropriate findings.  On remand, the parties may still

present arguments as to whether any of WAH's conduct after 31 December 2016

constituted a waiver of the alleged violations occurring prior to 3 October 2016,

including the presentation to Roberts of the 3 January 2017 document labeled as a

lease amendment.  However, we hold that a landlord does not, by accepting rents,

waive the right to terminate an automatically-renewing lease at the end of the lease

term for breaches of the lease where (1) the landlord notifies the tenant of the

---

[4] WAH also alleged that Roberts was an improper holdover on an expired lease. However, WAH no longer pursues this claim, and it is unavailing in any case.  Under the terms of the lease, which mirror the requirements of federal law, Roberts could only be evicted for specifically enumerated reasons or "other good cause."  Otherwise, unless Roberts terminated the lease herself, it would automatically renew at the end of each lease term.  As a result, Roberts could not be a "holdover tenant" in the sense that she would be subject to eviction for simply remaining after the expiration of her lease.  Without action on her part, the lease would not ordinarily expire.

breaches; (2) the landlord communicates to the tenant that, as a result of the breaches, the landlord will not renew the lease at the end of the then-effective lease term; (3) the landlord accepts rent from the tenant through the end of the then-effective lease term; and (4) non-renewal of the lease is specifically enumerated in the lease as a remedy to the landlord in case of a breach by the tenant.

When a landlord accepts rent from a tenant knowing that the tenant has breached the lease, the acceptance "will ordinarily be treated as an affirmation by him that the contract of lease is still in force, and he is thereby estopped from setting up a breach in any of the conditions of the lease and demanding a forfeiture thereof." *Winder v. Martin*, 183 N.C. 410, 411, 111 S.E. 708, 709 (1922).

> It is the generally accepted rule that if the landlord receive rent from his tenant, after full notice or knowledge of a breach of a covenant or condition in his lease, for which a forfeiture might have been declared, such constitutes a waiver of the forfeiture which may not afterwards be asserted for that particular breach, or any other breach which occurred prior to the acceptance of the rent.

*Id.* This doctrine of waiver is based "on the ground that the landlord has an election. He may choose whether he will declare the lease at an end and reenter at once, or whether he will overlook the breach and let the lease remain in force." *Id.* (quoting *Palmer v. City Livery Co.*, 98 Wis. 33, 34, 73 N.W. 559, 559 (1897)).

In the ordinary case, where a lease does not by its terms provide for automatic renewal, this proposition is somewhat unremarkable. A landlord faced with a tenant in breach of the lease may either terminate the lease immediately or forgive the

breach. If the landlord instead elects not to renew the lease at the end of the lease term, then the landlord has effectively chosen to forgive the breach. This is because, where the lease would terminate anyway, the landlord is under no obligation to continue to perform upon expiration of the lease—the contractual relationship between the parties dissolves at the end of the lease term. The landlord has not taken advantage of any "right to excuse or repudiate his own performance." *Wachovia Bank & Tr. Co., N. A. v. Rubish*, 306 N.C. 417, 426, 293 S.E.2d 749, 755 (1982). Thus, in the ordinary case of a non-renewing lease, a landlord who knows that a tenant has breached the lease and subsequently accepts rent from the tenant waives any right to assert the breach in court. *See, e.g.*, *Fairchild Realty Co. v. Spiegel, Inc.*, 246 N.C. 458, 468, 98 S.E.2d 871, 878 (1957).

The case is different, however, if the lease would automatically renew at the end of the lease term without a breach by the tenant. In that circumstance, a decision not to renew the lease but also not to pursue immediate eviction does not amount to forgiving the breach. Instead, the landlord has sought to address the tenant's breach by pursuing a remedy specifically laid out in the lease. In this case, the landlord does not have to "choose whether he will declare the lease at an end and reenter at once, or whether he will overlook the breach and let the lease remain in force." *Winder*, 183 N.C. at 411, 111 S.E. at 709. Instead, the lease provides a third option: suspending the lease's automatic renewal provision and ending it at the completion of the lease term. Of course, a landlord cannot make inconsistent elections. For

example, once the landlord has chosen the remedy of nonrenewal, the landlord has necessarily elected not to seek immediate eviction and cannot then "declare the lease at an end and reenter at once." *Id.* However, if nonrenewal of a lease is a remedy specified in the lease in case of a tenant's breach, then a landlord's decision not to pursue immediate eviction is not a waiver of the landlord's right to terminate the lease at the end of its term.

The lease agreement between WAH and Roberts automatically renewed each year unless it was terminated pursuant to the lease terms. Under the lease terms, WAH could only terminate the lease for specifically enumerated breaches of the lease or other good cause. Therefore, WAH was required to renew the lease with Roberts unless Roberts breached the lease in one of the ways specifically listed in the lease or established other good cause for the lease's termination. WAH's acceptance of rent and election to terminate the lease at the end of its term, then, could not be a waiver of the breaches to which the termination was intended to respond.

WAH sent a letter to Roberts on 3 October 2016 notifying her that her lease would terminate on 31 December 2016, the end of its then-effective term. The letter specifically stated the lease provisions that WAH believed Roberts had violated and stated specific examples of how she had violated those terms. Rather than seeking to evict Roberts immediately, WAH gave her almost three months in which to organize her affairs and find alternative housing, or to prepare her defense to eviction, when the lease required notice of, at most, 30 days. On these facts, WAH's

acceptance of rent is not a waiver of its right to pursue a remedy specifically contemplated in the lease agreement.

**Termination of the lease and subsidy**

Roberts's lease and subsidy payments could only be terminated if WAH complied with the applicable federal law.  By its terms, the lease agreement required that any termination of the lease by WAH "be carried out in accordance with HUD regulations."  Paragraph four of the lease also incorporates "the time frames and administrative procedures set forth in HUD's handbooks, instructions and regulations related to administration of multifamily subsidy programs" as those sources relate to changes in the tenant rent or the subsidy payments.  In addition to administrative regulations, federal statutes provide tenants with protections that must be followed.  *See, e.g.*, 42 U.S.C. § 3544(c)(2)(B) (2018) (prohibiting the termination, denial, suspension, or reduction of public housing benefits unless proper steps are followed).  HUD regulations specify how much a tenant can be charged in rent and when a lease can be terminated.  *See* 24 C.F.R. § 880.607[5] (2018) (lease termination requirements for Section 8 Housing Assistance Payments for New Construction); *id.* § 5.628 (calculation of total tenant payment from which is derived

---

[5] It is not entirely clear from the record which specific Section 8 project-based assistance program controlled Ms. Roberts's housing arrangement.  However, the programs have similar requirements as they relate to the points discussed in this opinion.  In any case, the record would benefit from greater exploration of this issue on remand.

tenant rent). It is clear, then, that WAH was only entitled to terminate Roberts's subsidy and lease in the event it acted in accordance with federal requirements.

The record contains no findings as to whether WAH complied with federal requirements. The lease between WAH and Roberts specifies many reasons that the lease may be terminated, but only two are relevant on the facts of this case: the lease may be terminated for "[Roberts's] material noncompliance with the terms of" the lease, or it may be terminated "for other good cause." If the trial court determines that WAH did not waive the alleged breaches, the trial court must determine whether the alleged breaches occurred, whether they meet the standards set out in the lease, and whether WAH complied with federal law. Under the terms of the lease itself, WAH may only "rely upon those grounds cited in the termination notice required by" the lease.

**Nonpayment of rent**

The trial court entered its judgment, and the Court of Appeals affirmed that judgment, on the basis that Roberts should be evicted for nonpayment of rent for January 2017 and part of February 2017. This conclusion was erroneous.

First, and most straightforwardly, WAH cannot pursue this ground of eviction under the terms of the lease. Under the lease's terms, WAH can only pursue grounds for eviction that are "cited in the termination notice required by" the lease terms. The only such termination notice in the record issued prior to the filing of the summary ejectment action on 5 January 2017 is the notice dated 3 October 2016. That notice

stated that the lease was being terminated for "material noncompliance, based on [Roberts's] repeated lease violations which have disrupted the livability of the property, adversely affected the health or safety of residents and staff, the peaceful enjoyment of other residents to the property, and interfered with the management of the property." The notice makes no mention of nonpayment of rent. As a result, without a lease-compliant notice that Roberts failed to pay rent in January 2017 and part of February 2017, it cannot pursue eviction on this basis under the lease.

Second, it is unclear from the record what the basis is for the nonpayment of rent allegation. Under the lease agreement between Roberts and WAH, Roberts paid $139 per month in rent. WAH also received a payment from HUD pursuant to an agreement between WAH and HUD. However, the rent amount paid by Roberts is controlled by paragraph three of the lease agreement between WAH and Roberts. Paragraph four of the lease agreement controls any changes to tenant rent. For example, a change in the tenant's rent requires "at least 30 days advance written notice of any increase" except in certain circumstances, none of which apply to the present case. Further, the lease agreement provides that WAH may change the tenant's "rent or tenant assistance payment only in accordance with the time frames and administrative procedures set forth in HUD's handbooks, instructions and regulations related to administration of multifamily subsidy programs." However, the trial court made no findings of fact as to whether any change in the tenant rent was made consistent with these requirements.

Further, Roberts asserted in her answer to WAH's amended complaint that she tendered rent in the amount of $139 in January of 2017, and that the tender was rejected by WAH's property manager. WAH admitted in its reply that it refused Roberts's offer of payment. Whether Roberts tendered her rental payment and WAH refused the offer is relevant to determining whether the landlord can evict for non-payment of rent. *See* N.C.G.S. § 42-33 (2019); *Hoover v. Crotts*, 232 N.C. 617, 618, 61 S.E.2d 705, 706 (1950) (where tenant tenders rent due and landlord declines to accept, landlord may not take possession for nonpayment of rent).

Roberts began paying a rent bond of $532 per month beginning in mid-February of 2017. On the record before us, it appears that she has made the payments consistently every month. If there was no change to tenant rent made consistent with the terms of the lease, then Roberts's rent under the lease remained $139 per month. Therefore, Roberts would have more than satisfied any past-due rent owed by April of 2017 at the latest. On the other hand, if the rent owed by Roberts was effectively and properly changed to $532 per month, then Roberts would not have already paid the rent owed for January 2017 and part of February 2017.

As a result, findings of fact are necessary as to WAH's actions regarding the termination of Roberts's subsidy payments and related increase in her required rental payments, and whether the lease terms and federal law were followed. As these findings will necessarily bear on Roberts's UDTP counterclaim, that counterclaim would need to be reconsidered in light of these findings.

Conclusion

The Court of Appeals is reversed for the reasons explained above. The case is remanded to the Court of Appeals for further remand to the District Court, Forsyth County, for proceedings consistent with this opinion.

REVERSED AND REMANDED.

Justice DAVIS did not participate in the consideration or decision of this case.

Justice NEWBY concurring in part and dissenting in part.

I concur with the majority's ultimate holding in this case that the landlord did not, by accepting rents during the notice period, waive the right to evict the tenant for violations of the lease agreement. I disagree with the majority's conclusion regarding the viability of the tenant's unfair and deceptive trade practices (UDTP) claim. Instead, I agree with the determination of the Court of Appeals that the tenant has alleged no injury and therefore cannot legally proceed on a UDTP claim. On this issue, I respectfully dissent.

The district court concluded that the tenant did not present sufficient evidence to establish a UDTP claim based on the termination of her rental subsidy. The Court of Appeals affirmed the trial court, concluding that the tenant presented "insufficient evidence in this case of an injury proximately caused by the alleged act or practice" and thus failed to prove her claim. *Winston Affordable Housing, LLC v. Roberts*, No. COA18-553, 2019 WL 2510879 at *4 (N.C. Ct. App. June 18, 2019) (unpublished). The Court of Appeals correctly affirmed the trial court's dismissal of the tenant's UDTP claim.

> We review a dismissal under Rule 12(b)(6) de novo, "view[ing] the allegations as true and . . . in the light most favorable to the non-moving party." *Kirby v. N.C. DOT*, 368 N.C. 847, 852, 786 S.E.2d 919, 923 (2016) (quoting *Mangum v. Raleigh Bd. of Adjust.*, 362 N.C. 640, 644, 669 S.E.2d 279, 283 (2008)). Dismissal is proper when the complaint "fail[s] to state a claim upon which relief can be granted." *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 448, 781 S.E.2d 1, 7 (2015) (alteration

> in original) (quoting N.C.G.S. § 1A-1, Rule 12(b)(6) (2013)). "When the complaint on its face reveals that no law supports the claim . . . or discloses facts that necessarily defeat the claim, dismissal is proper." *Id.* at 448, 781 S.E.2d at 8 (citing *Wood v. Guilford County*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002)).

*Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5, 802 S.E.2d 888, 891 (2017) (alterations in original).

"Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C.G.S. § 75.1.1(a) (2019). "In order to establish a prima facie claim for unfair trade practices, a plaintiff must show: (1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Bumpers v. Cmty. Bank of N. Virginia*, 367 N.C. 81, 88, 747 S.E.2d 220, 226 (2013) (alterations in original) (quoting *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001)). Here, even if we assume the landlord committed an unfair and deceptive trade practice, the tenant is unable to show that the action caused injury. Therefore, dismissal is proper.

The tenant has continuously remained in the apartment; thus, she has not been injured by eviction. Based on the evidence presented, the magistrate set the amount of rent at the market rate of the apartment with the money to be paid to the clerk of court, and the district court denied the tenant's motion to reduce it. The tenant began making those payments beginning 24 February 2017. If, on remand,

the trial court determines that the rent bond amount exceeds the actual rent she owed, the money will be returned. Therefore, the trial court properly dismissed the UDTP claim for failing to allege an injury. I respectfully dissent.