Sivadhanam v. 7 Hills Learning, LLC, 2021 NCBC 53.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE SUPERIOR COURT DIVISION |
| WAKE COUNTY | 20 CVS 4791 |

SRINIVAS SIVADHANAM, individually and derivatively of 7 HILLS LEARNING, LLC and 7 HILLS LEARNING WAKE FOREST, LLC,

          Plaintiffs,

v.

7 HILLS LEARNING, LLC; 7 HILLS LEARNING WAKE FOREST, LLC; CHANDRASEKHAR PUCHAKAYALA; and JITHENDAR KANCHARLA,

          Defendants.

**ORDER AND OPINION ON PLAINTIFF'S MOTION TO DISMISS AMENDED COUNTERCLAIM**

1. THIS MATTER is before the Court on Plaintiff Srinivas Sivadhanam's ("Plaintiff") Motion to Dismiss Amended Counterclaim (the "Motion" or "Motion to Dismiss") pursuant to North Carolina Rule of Civil Procedure ("Rule(s)") 12(b)(6) filed on 17 February 2021 in the above-captioned case. (ECF No. 15.) For the reasons stated below, the Motion is DENIED.

> *Graebe Hannah & Sullivan, PLLC, by Christopher T. Graebe and John William Graebe, for Plaintiff Srinivas Sivadhanam.*

> *Fiduciary Litigation Group, by Thomas R. Sparks, for Defendants Chandrasekhar Puchakayala and Jithendar Kancharla.*

Earp, Judge.

## I.    INTRODUCTION

2. The individual parties in this matter are members of three LLCs, two in North Carolina and one in New Jersey, that were organized to operate childcare

centers under franchise agreements with The Learning Experience ("TLE"). Plaintiff brings this action individually and on behalf of the North Carolina entities alleging that his colleagues are engaged in self-dealing and waste of corporate assets. Defendants counterclaim that Plaintiff's alleged mismanagement of the New Jersey franchise constitutes a breach of fiduciary duty owed to them. The pending Motion pertains to this counterclaim. A central issue is whether there is a controlling operating agreement, oral, written, or otherwise, that speaks to the parties' duties to each other.

## II.    FACTUAL BACKGROUND

3.    The Court does not make findings of fact when ruling on a motion to dismiss under Rule 12(b)(6). *See, e.g.*, *Concrete Serv. Corp. v. Invs. Grp., Inc.*, 79 N.C. App. 678, 681 (1986). Rather, the Court tests the claims by stating the relevant factual allegations in the Amended Answer and Counterclaims ("Amended Counterclaim") construed in Defendants' favor without being bound to any of the alleged legal conclusions.

4.    On 3 October 2012 Defendants Chandrasekhar Puchakayala ("Charlie") and Jithendar Kancharla ("Jeetu"; together, "Defendants") executed a franchise agreement with TLE in contemplation of their purchase of a TLE franchise in Chapel Hill, North Carolina. (Am. Answer & Countercls. ¶ 1 [hereinafter "Countercl."], ECF No. 3.) Two weeks later, Defendants and Plaintiff signed a document entitled

"Partnership Agreement," which gave each party a one-third interest in their enterprise. (Countercl. ¶ 2; *see* Partnership Agreement, ECF No. 16.1.[1])

5. The Partnership Agreement specifically references the North Carolina Uniform Partnership Act (the "Uniform Partnership Act"), stating that the parties "desire to join together in a general partnership under and pursuant to the Uniform Partnership Act, amended from time to time[.]" (Partnership Agreement, at Explanatory Statement); *see* N.C.G.S. § 59-31, *et seq*. The Partnership Agreement limits any duties imposed by the Uniform Partnership Act by allowing each partner to "engage in and possess any interest in other business or ventures of every nature and description, independently or with other persons, whether or not, directly or indirectly, in competition with the business or purpose of the Partnership[.]" (Partnership Agreement, at § 8.2.)

6. The Partnership Agreement has never been terminated. (Countercl. ¶ 5.)

A.    **The North Carolina Franchises (Chapel Hill and Wake Forest)**

7. On 24 October 2012 the parties organized Nominal Defendant 7 Hills Learning Center, LLC to operate the Chapel Hill TLE franchise (the "Chapel Hill

---

[1] Although Defendants did not attach any of the relevant documents to their Counterclaim, the Court may review on a motion to dismiss "a document . . . expressly referenced," included in the Complaint or Answer, and integral to the claims without converting the motion to one for summary judgment. *Tomlin v. Dylan Mortg. Inc.*, 2000 NCBC LEXIS 11, at *2 n.1 (N.C. Super. Ct. June 12, 2000); *see Oberlin Cap., L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001) ("[W]hen ruling on a Rule 12(b)(6) motion, a court may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant."). Thus, the Court cites to those Plaintiff's exhibits integral to Defendants' claim.

LLC"). (Countercl. ¶ 7.) The parties agree that they never executed a separate document entitled "operating agreement" for the Chapel Hill LLC. (Countercl. ¶ 3; Compl. ¶ 11, ECF No. 2.)

8. On 25 October 2012 the parties amended their franchise agreement with TLE to include Plaintiff. (Countercl. ¶ 8.)

9. The parties agreed to be bound to the terms of the TLE franchise agreement, which contains a provision that each of them, individually, as well as the entity they thereafter organize, is considered an "Affiliate." (Countercl. ¶ 9(a).)

10. Notably, the franchise agreement also contains a cross-default provision giving TLE the right, in the event of default, not just to terminate the franchise agreement of the defaulting franchise, but also to terminate (or pursue other available remedies against) any other TLE franchise owned by any of the Affiliates, even if that other franchise was co-owned by a party who had no ownership interest in the defaulting franchise. (Countercl. ¶ 9(c); *see* First. Am. Franchise Agreement, ECF No. 16.2.)

11. On 8 July 2016 the parties organized Nominal Defendant 7 Hills Learning Wake Forest, LLC (the "Wake Forest LLC"; together with the Chapel Hill LLC, the "North Carolina LLCs"), (Countercl. ¶ 12), for the purpose of establishing a TLE franchise in Wake Forest, North Carolina, (Countercl. ¶ 13). They entered into a franchise agreement for the Wake Forest LLC on 22 August 2016. That franchise agreement contains the same cross-default provision as appears in the franchise agreement for the Chapel Hill LLC. (Countercl. ¶ 14.) And, as with the Chapel Hill

LLC, the parties did not execute a separate document entitled "operating agreement" for the Wake Forest LLC. (Countercl. ¶ 15; *see also* Compl. ¶ 11.)

12. On or about 2 September 2016, Defendants and Plaintiff amended their Partnership Agreement to include a fourth business partner, Rahul Patel ("Patel"), making each of them 25% interest-holders in the Wake Forest LLC. (Countercl. ¶ 17.) Patel executed the franchise agreement for the Wake Forest childcare center on 8 September 2016. (Countercl. ¶ 18.)

13. On 28 February 2018, however, Patel left the Wake Forest LLC. The parties then executed a "Partnership Dissolution Agreement" dissolving the partnership only as to Patel and returning the parties to a one-third interest each. (Countercl. ¶ 19.)

### B. The New Jersey Franchise

14. At some point in 2016, Plaintiff expressed to Defendants his interest in acquiring a third TLE franchise, this time in New Jersey, and offered Defendants the opportunity to join him. Defendants declined the offer. (Countercl. ¶ 21.)

15. Thereafter, on 1 December 2016 Plaintiff organized a New Jersey LLC under the name 7 Hills Learning, LLC (the "New Jersey LLC") and served as its sole member. (Countercl. ¶ 22.) On 15 December 2016 Plaintiff executed a franchise agreement with TLE containing substantially the same provisions as stated above. (Countercl. ¶ 23.) Plaintiff also executed a loan to fund the New Jersey LLC from either TLE or a TLE-owned entity. (Countercl. ¶ 26.)

16.     Plaintiff operated the New Jersey LLC alone until June 2017, although he frequently sought Jeetu's advice. (Countercl. ¶¶ 28–29.) Unfortunately, the New Jersey LLC struggled, and "staff morale was low, enrollments dropped precipitously, revenues decreased substantially, [and] employee retention became problematic," among other things. (Countercl. ¶ 30.) Given Plaintiff's involvement with Jeetu in the North Carolina franchises, TLE contacted both Plaintiff and Jeetu about its concerns. (Countercl. ¶¶ 31–32.)

17.     By late May or early June 2017, the New Jersey LLC's financial condition had deteriorated to the point that Plaintiff had sought assistance from Charlie, who loaned the New Jersey LLC a total of $75,000. (Countercl. ¶ 33.) Plaintiff sought help from both Defendants to "keep the New Jersey [LLC] viable and operating." (Countercl. ¶ 34.)

18.     Meanwhile, TLE informed Defendants that pursuant to the cross-default provisions in each of the franchise agreements, it would look to the North Carolina LLCs to cover the resulting damages should the New Jersey LLC default. (Countercl. ¶ 35.) According to Defendants, they faced a Hobson's choice: let the New Jersey LLC default and risk the future of the North Carolina LLCs, or help Plaintiff keep the New Jersey LLC from defaulting and save the North Carolina LLCs from application of the cross-default provision. (Countercl. ¶ 36.)

19.     Even though they had not wanted to participate in the New Jersey operation, Defendants chose the latter option, joined in the ownership of the New Jersey LLC, and assumed the TLE loan, which had a balance of approximately

$165,000 at that time. (Countercl. ¶¶ 38–39.) On 12 June 2017 Jeetu and Charlie signed a franchise agreement with TLE for the New Jersey LLC. (Countercl. ¶ 42.)

20. Prior to committing to invest in the New Jersey LLC, Defendants requested the New Jersey LLC's financial records to conduct their due diligence, but Plaintiff refused to provide them. (Countercl. ¶ 40.) Defendants allege that "[i]n a normal franchise acquisition process, such a refusal of financial transparency would make the potential purchaser terminate the process; however, in this case, [Defendants] knew that, had they not tried to salvage what they could of the New Jersey [LLC], they risked default of the North Carolina [LLCs]." (Countercl. ¶ 41.) Calling their participation a "forced ownership," (Countercl. ¶ 43), Defendants allege that they had "no choice but to tolerate their business partner's abject lack of concern or appreciation for what they were doing for him." (Countercl. ¶ 41).

21. After joining as members, Defendants made capital contributions to the New Jersey LLC to keep the center running. Jeetu contributed a total of $77,000, and Charlie contributed a total of $89,000. (Countercl. ¶ 43.) Jeetu also took a personal loan of $100,000 to help fund the New Jersey LLC's flagging operations. (Countercl. ¶ 45.)

22. Meanwhile, Plaintiff did not contribute "equally" to the New Jersey LLC's finances. (Countercl. ¶ 44.) The same was true of its operations. Although not his desire to do so, Jeetu "undertook an active role in management." At the same time, however, Plaintiff "essentially abandoned the center." (Countercl. ¶¶ 46–47.)

23. Shortly after joining the operation, Defendants discovered that bills had gone unpaid for months and learned that the building had fallen into disrepair. (Countercl. ¶ 48.) Despite their efforts, the downward spiral continued. TLE finally issued a notice of default on 15 October 2017. (Countercl. ¶ 49.)

24. In early 2018, the parties paid $100,000 of their personal funds as part of a transaction to extricate themselves from the New Jersey Center and transfer the business to an unrelated third party. (Countercl. ¶ 50.) The transaction also required that the Chapel Hill LLC assume repayment of the TLE loan, which still had a balance of approximately $165,000, and Defendants were required to personally guarantee all the debt of the New Jersey Center, including this loan. (Countercl. ¶ 51; *see also* Countercl. ¶ 9(d) (stating that each party "personally guaranteed all obligations of the Chapel Hill TLE [f]ranchise incurred by any of them during their operation of it" under the franchise agreements).)

25. Defendants allege that, despite having to take on "substantial and unanticipated" debt from the New Jersey LLC, they have continued to manage the North Carolina LLCs successfully. (Countercl. ¶ 53.) However, they contend that Plaintiff's actions with respect to the New Jersey LLC render him directly and personally liable to Defendants for breach of fiduciary duty. (Countercl. ¶ 57.) This is because, according to Defendants, the Partnership Agreement and franchise agreements together constitute the operating agreement for both North Carolina

LLCs and impose special "partnership-like" fiduciary duties on the members.[2] (Countercl. ¶ 16.)

### III.   PROCEDURAL BACKGROUND

26.   Plaintiff filed his Complaint on 14 April 2020.   (Compl.)

27.   Defendants filed their Answer and Counterclaims on 7 July 2020, (Answer & Countercls., ECF No. 6), and their Amended Counterclaim on 5 January 2021.   In their Amended Counterclaim, Defendants assert a single claim for breach of fiduciary duty individually against Plaintiff.   (Countercl. ¶¶ 58–61.)

28.   Plaintiff filed his Motion to Dismiss Amended Counterclaim on 17 February 2021.   (Mot. Dismiss Am. Countercl., ECF No. 15.)   The Motion has been fully briefed, and the Court heard oral arguments during a Hearing held on 11 August 2021, at which all parties except the nominal defendants were represented by counsel.[3]   The Motion is now ripe for determination.

### IV.   LEGAL STANDARD

29.   "When reviewing a [counterclaim] . . . under Rule 12(b)(6), [the Court] treat[s] a [claimant's] factual allegations as true."   *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 442 (2008) (quoting *Stein v. Asheville City Bd. of*

---

[2] Despite the fact that one of the documents at issue is entitled "Partnership Agreement," and contrary to paragraph 16 of the Amended Counterclaim, (Countercl. ¶ 16 (stating the theory that the parties are partners who owe each other fiduciary duties)), during the 11 August 2021 hearing on this Motion (the "Hearing"), counsel for Defendants stated that Defendants do not contend that the parties were actually partners at the time of the relevant events.   Rather, Defendants contend that they, along with Plaintiff, were members in both of the North Carolina LLCs but that the Partnership Agreement governed their relationship. (Aug. 11, 2021 Hr'g Tr. 47:24–48:6 [hereinafter "Tr."], ECF No. 41.)

[3] Nominal Defendants have been unrepresented at all times since the filing of the Complaint.

*Educ.*, 360 N.C. 321, 325 (2006)). However, "conclusions of law or unwarranted deductions of fact are not admitted." *Wray v. City of Greensboro*, 370 N.C. 41, 46 (2017) (quoting *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 448 (2015)).

30. "Dismissal of an action under Rule 12(b)(6) is appropriate when the [counterclaim] 'fail[s] to state a claim upon which relief can be granted.' " *Arnesen*, 368 N.C. at 448 (quoting N.C. R. Civ. P. 12(b)(6)); *see also Wray*, 370 N.C. at 46 ("A complaint should not be dismissed under Rule 12(b)(6) . . . unless it affirmatively appears that plaintiff is entitled to no relief under any state of facts which could be presented in support of the claim." (citation and internal quotation marks omitted)).

31. "[A counterclaim] fails in this manner when: '(1) the [counterclaim] on its face reveals that no law supports the [defendants'] claim; (2) the [counterclaim] on its face reveals the absence of facts sufficient to make a good claim; or (3) the [counterclaim] discloses some fact that necessarily defeats the [defendants'] claim.' " *Krawiec v. Manly*, 370 N.C. 602, 606 (2018) (quoting *Wood v. Guilford Cty.*, 355 N.C. 161, 166 (2002)).

## V. ANALYSIS

32. Despite alleging in the alternative that the parties are either "Partners who . . . owe fiduciary duties to each other" or "Co-Members of limited liability companies who have expanded their duties to each other by making them fiduciaries of each other," and despite referencing fiduciary duties Plaintiff "owes his business partners," (Countercl. ¶¶ 16, 59), at the Hearing, Defendants abandoned their

partnership theory. Instead, they embraced their status as members of two LLCs but argued that the LLCs' operating agreement, which they contend is composed of a combination of the pre-existing Partnership Agreement and the franchise agreements, created fiduciary duties that Plaintiff breached. (Tr. 47:24–48:6.)

33. Plaintiff seeks dismissal of Defendants' breach of fiduciary duty claim based on the well-established rule in North Carolina that LLC members do not owe fiduciary duties to their fellow members, (Br. Supp. Pl.'s Mot. Dismiss Am. Countercl. 9 [hereinafter "Pl.'s Br."], ECF No. 16), and because, they argue, the Partnership Agreement and franchise agreements do not impose specific fiduciary duties, (Pl.'s Br. 10).

34. "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651 (2001). "As explained by our Court of Appeals, the North Carolina Limited Liability Company Act 'does not create fiduciary duties among members' of an LLC." *Slattery v. Appycity, LLC*, 2021 NCBC LEXIS 24, at *24 (N.C. Super. Ct. Mar. 24, 2021) (quoting *Kaplan v. O.K. Techs., LLC*, 196 N.C. App. 469, 473 (2009)); *see generally* N.C.G.S. § 57D-1-01, *et seq*.

35. In addition, it is settled law that LLC members generally cannot maintain an individual claim against another member for harms suffered by the LLC. *See Green v. Freeman*, 367 N.C. 136, 142 (2013) ("The general rule is that '[s]hareholders, creditors or guarantors of corporations generally may not bring individual actions to recover what they consider their share of the damages suffered

by the corporation.' " (quoting *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 660 (1997)); *Bennett v. Bennett*, 2019 NCBC LEXIS 19, at \*13 (N.C. Super. Ct. Aug. 6, 2019) ("These rules apply equally to LLCs and their members because the members are, for this purpose, functionally equivalent to corporate shareholders." (citation and internal quotation marks omitted)).

36.     Under *Barger*, however, an LLC member may maintain an individual action against a fellow LLC member for a harm that "directly affects" the member if he can show "that the wrongdoer owed him a special duty or that the injury suffered by the [member] is separate and distinct from the injury sustained by the other [members] or the [LLC] itself." *Barger*, 346 N.C. at 659.

37.     As members of an LLC, the parties here were free to define their relationship. *See Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at \*17–18 (N.C. Super. Ct. June 19, 2019) ("Because 'an LLC is primarily a creature of contract,' the members are generally free to arrange their relationship however they wish. Among other things, they may depart from statutory default rules, . . . and impose or eliminate fiduciary duties for members and managers." (quoting *Crouse v. Mineo*, 189 N.C. App. 232, 237 (2008)) (citations omitted)).

38.     Typically, the relationship among and between the members and the LLC is defined in an operating agreement. However, the North Carolina Limited Liability Company Act does not require an operating agreement, nor does it prescribe the form that an operating agreement must take. *See* N.C.G.S. § 57D-1-03(23) (defining "operating agreement" as "[a]ny agreement concerning the LLC or any

ownership interest in the LLC to which each interest owner is a party or is otherwise bound as an interest owner" and stating that "the operating agreement may be in any form, including written, oral, or implied, or any combination thereof").

39.     Defendants plead repeatedly that the Partnership Agreement constitutes the governing document for their business enterprise, regardless of the term they used for themselves or the corporate form their business eventually took. Going a step further, Defendants plead that the franchise agreements, or at least certain provisions thereof, form part of the governing document, and that by describing their obligations with respect to the management of the North Carolina LLCs through these franchise agreements, they have further defined the fiduciary duties they owed to one another.  (*See, e.g.*, Countercl. ¶ 10 ("By October 25, 2012, [the parties] were business partners, and the terms of their partnership were defined by said Partnership Agreement and the obligations each owed to the others imposed by the Franchise Agreement and the amendment thereto.").)

40.     Defendants further plead that the incorporation of fiduciary duties imposed by the Uniform Partnership Act in the document creates "special duties" under *Barger*, permitting their direct action.  (Countercl. ¶ 16 ("[The parties are] Co-Members of limited liability companies who have expanded their duties to each other by making them fiduciaries of each other[.]"); *see also* Br. Opp'n Mot. Dismiss Am. Countercl. 14 [hereinafter "Br. Opp'n"], ECF No. 21 ("[B]y virtue of the reality that the parties executed the Partnership Agreement, they elected to impose, individually, fiduciary duties on themselves to each other.").)

41. The Court determines that, under the standard set by Rule 12(b)(6), Defendants have alleged facts sufficient to state a claim.

42. In his briefing and at the Hearing, Plaintiff urged the Court to go beyond the pleadings and to consider as determinative how unlikely it would be for the parties to intend for a Partnership Agreement and franchise agreements that predate the formation of the LLCs to constitute the operating agreement for the LLCs. (Reply Br. Pl.'s Mot. Dismiss Am. Countercl. 7, ECF No. 25 ("[W]hen the Partnership Agreement and Franchise Agreement (and the amendment adding [Plaintiff]) were executed, the two [North Carolina] LLCs *did not exist*."); Tr. 9:20–10:4 (highlighting the argument's "facial absurdity").) However, nothing in the LLC Act forbids the formation of an operating agreement prior to organization of the LLC itself, *see* N.C.G.S. § 57D-1-03(23), nor has Plaintiff presented any authority supporting that proposition.

43. The Court observes that the Partnership Agreement expressly contemplates the formation of an entity to operate as a "[d]ay care center" under TLE, and that the Partnership Agreement was executed only seven days prior to the organization of the Chapel Hill LLC. (*See* Partnership Agreement.) The short period of time between execution of the Partnership Agreement and the formation of the first LLC contemplated under the Partnership Agreement suggests that the Partnership Agreement, at the very least, "concern[ed] the LLC[.]" *See* N.C.G.S. § 57D-1-03(23).

44. In addition, the parties' franchise agreements, which also contemplate the existence of TLE childcare centers and contain the cross-default provisions, were likewise executed in close proximity to the time the LLCs were organized. The Court cannot ignore the parties' pleading stating that they intended for the several agreements in combination to establish their duties to each other. (*See* Countercl. ¶¶ 1, 8, 14); *see also* N.C.G.S. § 57D-1-03(23).

45. Furthermore, in this case, Defendants allege that their relationship began with the Partnership Agreement and that they continued to abide by its terms to both add and subtract Patel as a member after the LLCs were organized. (*See* Countercl. ¶¶ 17, 19.) The parties' continued reliance on the Partnership Agreement and its terms, even after formation of the LLCs, could indicate that the parties still considered the Partnership Agreement to govern their relationship and explain why they never refashioned the documents into a more traditional operating agreement.

46. The Court cannot say as a matter of law, then, that the Partnership Agreement, alone or in combination with the franchise agreements, constitutes or does not constitute an operating agreement that created fiduciary duties between and among the parties.

47. Plaintiff urges the Court to take judicial notice of Defendants' sworn statements in another forum as proof that no operating agreement existed for the North Carolina LLCs. (Pl.'s Br. 10–11.) On a motion to dismiss, the Court may "consider records of which it has taken judicial notice." *BB&T Boli Plan Trust v. Mass. Mut. Life Ins. Co.*, 2016 NCBC LEXIS 36, at \*27 (N.C. Super. Ct. Apr. 29, 2016)

(citing *Wood v. J.P. Stevens & Co.*, 297 N.C. 636, 641 (1979) ("[I]t is clear that judicial notice can be used in rulings on . . . motions to dismiss for failure to state a claim[.]")). The Court may take judicial notice of adjudicative facts that are not subject to reasonable dispute because they are either "generally known within the territorial jurisdiction of the trial court" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." N.C. R. Evid. 201(a)–(b).

48. Plaintiff has presented Defendants' sworn statements from a Verified Complaint filed in New Jersey stating that "[t]he [North Carolina] LLCs were created without operating agreements and at no time since their creation have operating agreements been executed or otherwise ratified for these LLCs." (Verified Compl. ¶ 16, ECF No. 16.10.) Defendants further pleaded that in 2017, they "drafted and attempted to execute operating agreements for the [North Carolina] LLCs, as well as the [New Jersey] LLC, but [Plaintiff] refused to sign." (Verified Compl. ¶ 37.)

49. Defendants respond that their statements in the New Jersey pleading meant only that no document entitled "operating agreement" exists for either North Carolina LLC, but that they, instead, operated under the terms of the Partnership Agreement and the franchise agreements. (Tr. 23:20–24:11.)

50. Even were the Court to take judicial notice of this pleading as Plaintiff urges, the sworn statements do not foreclose Defendants' Amended Counterclaim at this juncture. Rather, the sworn statements establish that Defendants attempted to procure an executed document entitled "operating agreement" for each of the LLCs,

but that they were not successful. The statements do not speak directly to whether the parties intended for the Partnership Agreement and franchise agreements to serve as the LLCs governing documents until another agreement could be executed.

51. While it would be an unusual set of circumstances that would lead a fact-finder to conclude that the parties intended portions of commercial agreements, particularly those agreements that involve third parties such as the franchise agreements at issue here, to serve as the governing documents for a limited liability company, on this record the Court cannot as a matter of law rule out that possibility. This is particularly so when each of the documents explicitly references the business to be formed as the LLC. (*See, e.g.*, Partnership Agreement, at Explanatory Statement (stating that the parties desired to enter into the business of "purchasing, acquiring, operating, leasing, owning and selling Day care center from TLE[.]").)

52. Less unusual would be a scenario in which a closely held LLC starts as a "partnership" and continues to both refer to itself in those terms and govern itself by a "partnership agreement" even after organizing as an LLC. Again, under these unique circumstances, the Court cannot conclude that the facts alleged fail to present a claim under Rule 12(b)(6).

53. Defendants also point to the cross-default provisions within the franchise agreements in support of their theory that a higher standard of care was imposed on the Plaintiff. (Br. Opp'n 14–16.) The Court makes no determination at this time as to whether the parties ultimately intended the franchise agreements' terms to speak to their duties with respect to one another as part of an operating

agreement.  Instead, the Court determines that this is more properly decided on a more developed record.

54.     As to Plaintiff's argument that Defendants have failed to specify the fiduciary duty that was breached and how it was breached, the Court applies a notice pleading standard.  *Global Textile All., Inc. v. TDI Worldwide, LLC*, 2018 NCBC LEXIS 159, at *11 (N.C. Super. Ct. Nov. 29, 2018) ("North Carolina is a notice pleading state." (citing *Feltman v. City of Wilson*, 238 N.C. App. 246, 252 (2014))). "Under notice pleading, a statement of claim is adequate if it gives sufficient notice of the claim asserted to enable the adverse party to answer and prepare for trial, to allow for the application of the doctrine of res judicata, and to show the type of case brought."  *Feltman*, 238 N.C. App. at 252; (*see also* Countercl. ¶¶ 58–61 (alleging a breach of fiduciary duty claim that does not rise to the level of fraud)).  Accordingly, the Court concludes that Defendants have adequately alleged a claim for breach of fiduciary duty.

55.     In sum, based on the allegations in the Amended Counterclaim, the documents expressly referenced in the Amended Counterclaim and submitted to the Court, and the facts alleged that are unique to this case, the Court cannot say as a matter of law that no fiduciary duty exists between the parties.  *See Wray*, 370 N.C. at 46.

56.     The Court therefore DENIES Plaintiff's Motion to Dismiss.  However, the Court reserves judgment on which fiduciary duty has been implicated, whether under the Uniform Partnership Act or otherwise; whether a breach of fiduciary duty

has actually occurred; and whether the harms alleged here give rise to a direct claim under *Barger*. The Court merely holds at this juncture that Defendants' Amended Counterclaim, taken as true for purposes of this Motion, has pleaded facts sufficient to meet the Rule 12(b)(6) standard and proceed to discovery.

## VI. CONCLUSION

57. WHEREFORE, for the reasons set forth above, the Court hereby DENIES Plaintiff's Motion to Dismiss.

IT IS SO ORDERED, this the 8th day of September, 2021.


/s/ Julianna Theall Earp
Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases